**Lanier Allison RAMER, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 21985.**

United States Court of Appeals
Ninth Circuit.

May 15, 1969.

Rehearing Denied June 5, 1969.

Quimby Bingham (argued), Tacoma, Wash., for appellant.

J. S. Obenour (argued), Asst. U. S. Atty., Eugene G. Cushing, U. S. Atty., Tacoma, Wash., for appellee.

Before BARNES and MERRILL, Circuit Judges, and McNICHOLS, District Judge.

McNICHOLS, District Judge:

Appellant, Lanier Allison Ramer, was convicted, after jury trial, of escape from confinement at the United States Penitentiary at McNeil Island, Washington, in violation of 18 U.S.C. § 751. Jurisdiction in this Court depends on 28 U.S.C. § 1291.

The factual background leading to the conviction and appeal is not in serious dispute. The appellant did not take the stand to testify, except in preliminary matters out of the presence of the jury. Only one witness testified on behalf of the defendant, a psychiatrist, called to support a defense of insanity.

On September 21, 1965, Ramer began serving a sentence for bank robbery at the McNeil Island institution.[1] On March 16, 1966, he was reported to be missing from his work detail on a road repair project, on the Island, but outside of the walls of the penitentiary proper.[2] A search was immediately instituted and continued until March 21, 1966, at which time the appellant was discovered hiding among some items of machinery covered by a tarpaulin not far from the area where he had been assigned to work.

Appellant was immediately taken to the medical facility of the prison where the chief medical officer conducted a complete physical examination of his person. This was a routine procedure when escaped prisoners were recaptured. Ramer was found to be in generally good condition except for a redness of the feet indicating the effect of cold weather. The doctor noted that he also appeared to be "mentally competent". The patient was hospitalized for three or four days, until March 24, 1966, and medication given as a precaution against any infection of the feet.

On April 6, 1966, Dr. Harold B. Johnston, a qualified physician specializing in psychiatry, made a psychiatric examination of the appellant. Dr. Johnston, in private practice in Tacoma, Washington, had been a consulting psychiatrist to the staff physicians at the McNeil Island Penitentiary since 1956. He made regular monthly visits to the Prison where he conducted psychiatric examinations of such prisoners as the medical staff requested. It was customary to have him so examine inmates following reapprehension after escape. The purpose of the April 6, 1966, examination of Ramer, according to Dr. Johnston, was "to determine his mental competency and whether or not there was any need for treatment."

In the course of the April 6, 1966 psychiatric examination, Dr. Johnston discussed in generalities the details of the escape with Ramer. It is conceded that no "*Miranda*"[3] type warnings were given at the time of this examination.[4]

---

1   For background of the prior offense for which the appellant was so confined, see Ramer v. United States, 390 F.2d 564 (1968).

2.  McNeil Island, as the name implies, is an island, located in Puget Sound, not far from the City of Tacoma, Washington. This island, of an area of approximately 4400 acres, is totally utilized by the Penitentiary, its farm complex and a logging and sawmill operation. Ingress and egress to and from the Island is by way of a ferry or other water transportation.

3.  Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R. 3d 974.

4.  Ramer testified that an F.B.I. Agent interviewed him right after his apprehension on the escape charge and advised him at least partially as to his constitutional rights. No proof as to the extent of this warning was ever offered and the F.B.I. Agent did not testify.

A few days after March 21, 1966, one of Ramer's friends procured the services of Thomas H. S. Brucker, an attorney practicing in Seattle, Washington, to act on appellant's behalf. Brucker was a former Assistant United States Attorney in the Seattle area. On March 29, 1966, Brucker represented Ramer before the United States Commissioner at a hearing held at the Penitentiary. At this time appellant and his attorney were given such time as was needed to confer privately; additionally, transportation was furnished to Attorney Brucker so that he could familiarize himself with the physical aspects of the area where the escape was alleged to have occurred, the search conducted and the appellant reapprehended.

Subsequently, on November 15, 1966, the grand jury returned an indictment charging the appellant with escape.[5] Brucker continued to represent appellant until late November or early December, 1966. He communicated with his client by letter on a least six occasions and received from his client several letters. It is undisputed that all the correspondence was subject to prison inspection; each letter being opened and examined by prison employees before being forwarded to the addressee. Mr. Brucker having had experience as a United States Attorney anticipated that his letters would be so censored and took care that no material detrimental to the defense was included in the correspondence under surveillance. Brucker found it difficult to travel from his office in Seattle to the Penitentiary. The trip, including the ferry ride, consumed nearly two hours each way. Consequently he actually only conferred personally with his client at the March 29, 1966 Commissioner hearing and on July 29 and August 1, 1966,

when Ramer was brought to the Tacoma city jail for possible waiver of indictment. As indicated, Brucker ceased to represent appellant a few days after the grand jury indictment was filed.

Quinby R. Bingham, a Tacoma attorney, was promptly appointed to represent Ramer. Attorney Bingham has continued through the trial and this appeal to so represent the appellant and has done so in the most professional, competent and dedicated manner.[6]

After consultation with his client at the Tacoma jail, Bingham and appellant appeared in the trial court on December 19, 1966 for arraignment. A motion to dismiss based on the interception of mail between client and attorney was denied; a plea of not guilty entered; and at the request of defense counsel a psychiatric report was ordered. Dr. Donald S. Stubbs, a neuropsychologist on the staff of the Veterans Administration Hospital at American Lake, Washington, was appointed to examine the appellant and report to the Court. Dr. Stubbs reported, after examination, that Ramer was sane and mentally able to participate in his defense at trial and to understand the nature of the charges against him. Defense counsel tacitly agreed with this diagnosis and the Court so found.

On January 30, 1967, appellant again moved for (1) an order dismissing the indictment because of the interference with the mail communication between counsel and the prisoner-defendant, (2) an order to direct that such surveillance be discontinued and (3) for a continuance to appeal adverse rulings on these motions. The trial court heard full arguments on the motions, accepted certain affidavits and made rulings. He found that the custodial examination of pris-

---

5. The seemingly long delay from March to November before an indictment was secured is adequately explained in the record and is not raised as an issue in this action. It appears that appellant proposed to waive indictment, but wanted to delay waiver pending the outcome of an appeal from his prior conviction. (See Note 1, supra).

6. Ramer personally took an active part in his own defense to a much greater extent than is usual in criminal cases. However, his attorneys were apparently able to adapt to this situation and continued to function as effective counsel.

oner correspondence was proper and necessary to the security of the institution. He found that no information obtained from the correspondence had been made available to the grand jury which returned the indictment. He found further that appellant had been afforded adequate opportunities to confer privately with his counsel. On this basis all motions were denied, with a caveat to the United States Attorney and the prison officials that the appellant and his counsel were to be given all reasonable opportunities to confer privately so as to prepare the defense.

Appellant was permitted to renew these motions on March 27, 1967, the day before the scheduled trial. Evidence of Attorney Brucker and that of the appellant was heard by the Court. It was shown that Brucker had personally interviewed his client on two occasions in private to the extent he required. No confidential information was contained in the inspected correspondence. Attorney Bingham and Ramer were afforded numerous opportunities to confer privately at the Tacoma jail. Neither attorney was ever barred or discouraged from going to see appellant at the prison where private conferences would have been readily available. On this basis the very experienced trial judge held that no prejudice to the appellant had been shown and again rejected the motion to dismiss the indictment on the ground that inspection of mail had denied the appellant full representation by counsel.

The cause went to trial and the evidence of guilt was overwhelming. Since Ramer had indicated his intention to depend on insanity as a defense, the government called Dr. Harold B. Johnston to testify as to his opinion of the sanity of the accused at the time of the escape. It was proposed that such opinion would be based on the psychiatric examination conducted by the witness on April 6, 1966, heretofore described. At this point the defense objected on the grounds that (1) the defendant had not been advised of his constitutional right to remain silent, and to have the services of an attorney as required by the *"Miranda"* rule; and (2) that any communications to the Doctor were privileged by the physician-patient privilege rule.

The Court interrupted the trial and heard evidence outside the presence of the jury. Both Dr. Johnston and Ramer testified. The Doctor stated that he had gone to the prison on April 6, 1966, that Dr. Kyle, the Chief Medical Officer, indicated that a psychiatric evaluation of Ramer was desired and that Dr. Kyle introduced him to Ramer as the "Consulting Psychiatrist". He proceeded with the examination which lasted approximately forty-five minutes. The details of the escape were gone into in "moderate detail".

Ramer testified in this same voir dire hearing. He said that he was taken from his cell on April 6, 1966, conducted to the hospital area and told to wait for the consulting psychiatrist to call him. He stated that, when so summoned, and after some hesitation, he answered Dr. Johnston's questions on the details of his escape, assuming that ethically the Doctor would not use the information against him. On cross-examination he further testified that he considered himself the patient of Dr. Johnston at the time of the interview.

During argument on defendant's objection, the United States Attorney conceded that the practice of having psychiatric examinations of returned escapees had been suggested to the prison authorities by his office. He stated that in the past a defense of insanity had occasionally been raised in escape trials and that the early psychiatric evaluation on this point was needed as a part of the evidence to be presented in case insanity was later claimed as a defense. He further assured the Court that no statements made by the defendant to Dr. Johnston would be sought and that the Doctor would merely be asked his opinion on the sanity of Ramer at the time of the examination and at the time of his escape.

The Court ruled the evidence admissible and overruled the objections on the grounds stated. He found that no doctor-patient privilege existed and that the opinion of the psychiatrist on the question of sanity was not barred by the absence of warning or advice on constitutional rights. At the same time he made it abundantly clear that Dr. Johnston was to be carefully instructed and questioned so that no statements of Ramer bearing on the escape were to be alluded to in any manner.

Dr. Johnston then testified, describing his usual practice in conducting psychiatric examinations and stating that he followed similar procedures with Ramer. He gave as his opinion that, on March 16, 1966, the date Ramer was alleged to have eluded custody, Ramer knew right from wrong and had no mental derangement such as would cause him, even discerning between right and wrong, to be unable to adhere to the right.

Later in the trial, Dr. Kyle, Chief Medical Officer at the Prison, testified to his physical examination of the appellant at the request of the Warden on March 21, 1966. Objection was made, apparently again on the ground that no *"Miranda"* warning had been given and that the physician-patient privilege existed. The Court overruled the objections and the Doctor told of his physical examination with a finding of irritated or reddened feet. He also stated that he noted that Ramer appeared "mentally competent".

For the defense, Dr. Stubbs, who had conducted the psychiatric examination under the order of the Court, was called out of order during the government's case in chief. He gave as his opinion that Ramer was sane when examined on December 27, 1966, and probably sane on March 16, 1966.

While, as above indicated, the two psychiatrists, Doctors Johnston and Stubbs, were of the ultimate opinions that Ramer was sane at the time of his escape, they were likewise in agreement that he suffered from a form of character disorder.

In view of the issue raised herein by the appellant concerning the correct test for legal sanity, it is appropriate to enlarge on the testimony of the medical experts. The Doctors each found that appellant had "poor impulse control". There was expert evidence from which it might be concluded that he acted under some form of compulsion when he committed the offense and that this compulsion arose out of his mental or character disorder. Excerpts from the testimony of Dr. Johnston and Dr. Stubbs in this regard are set out by way of footnote.[7]

7. Dr. Johnston testified:

"* * *

"Q. By Mr. Bingham (defense counsel): What did you find in relation to Mr. Ramer's ability to control his impulses?

"A. He has very poor impulse control.

"Q. And what do you mean by poor impulse control?

"A. If he gets agitated or stirs up enough feeling, he will act on impulse without—even though he knows what he is doing, he will act as he feels at the moment.

"Q. And irregardless of the consequences of his act, you would do that?

"A. Yes, sir.

"Q. Do you think that there is any tendency to be self destructive as far as Mr. Ramer goes—is concerned?

"A. I didn't examine him to this extent.

"Q. What would be your opinion?

"A. It would seem that he had a tendency to do the wrong thing for himself much of the time in the past.

"Q. And this was brought on by the lack of ability to control himself?

"A. I believe so, yes, poor impulse control would certainly lead to this.

"Q. Now, I believe in a report that you wrote concerning him, you said that he shows a very big character disorder. What did you refer to by that?

"A. I refer to the inability to control himself even though knowing right from wrong, inability to control himself at times in doing whatever he wished to do. This goes along with the impulse control too. He responds according to his feelings even though he knows what he is doing at the time.

Note 7—Continued

"Q. And that would mean, say, he had an impulse to take something that didn't belong to him, he might do so?

"A. Yes, sir.

"Q. Through the lack of his ability to control himself?

"A. Yes, because of impulse problem.

"Q. And when does this feeling of knowing right from wrong, how does that come over when he gets this impulse?

"A. Well, it is not considered, it doesn't become a considered matter. He doesn't think about it. He doesn't concern himself with it.

"Q. In other words, prior to the impulse, he is able to know right from wrong, but when the impulse comes along, why, he no longer thinks about right from wrong, is that correct?

"A. He knows it, but he doesn't think about it.

"Q. In other words, if he had the ability to stop and reflect, he would know right from wrong?

"A. Yes.

"Q. But because of his lack of impulse control, he doesn't do so?

"A. He consistently has the ability to know right from wrong, but the impulse overwhelms this. It is still there, he still knows.

"Q. If I understand you, then you are saying, though that he does not stop and consider right from wrong when he gets this impulse?

"A. That's correct.
" * * * "

Dr. Stubbs testified:
" * * *

"Q. Doctor, how much control would a person with Mr. Ramer's abilities be able to manifest over what he does in times of tension?

"A. Could you clarify that question?

"Q. Well, say Mr. Ramer is in a period of stress, how much control is he able to bring about over his personal activities?

"A. I think his impulse control is very poor. I can't be more specific than to make that statement, which is my general impression.

"Q. In other words, he is a person that——

THE COURT: "Don't lead him. He doesn't need it to begin with. Let him say what he will.

"Q. By Mr. Bingham: By impulse control, would you reiterate what you meant?

"A. His ability to control his impulses, to act without forethought or reflex. That is my definition of impulse.

"Q. Would that mean that when Mr. Ramer does commit one of these acts, there is some form of compulsion?

"A. I should say there is an element of compulsion. I would guess that there might be.

"Q. And is this normal in the normal person?

"A. This certainly isn't normal. The degree of one's abilities to control one's impulses varies. I think that Mr. Ramer's impulse control is probably quite poor.

"Q. Doctor, is compulsive response one that a person is unable to prevent by exercise of his own will?

"A. Not necessarily so.

"Q. In what way?

"A. The compulsion has reference to unconscious drives that motivates a person and makes them act, and a compulsion is something that sometimes can be controlled. It is an impulse to act.

"Q. And if I understand you correctly, you say that Mr. Ramer has poor control over these impulses to act?

"A. Right.

"Q. Do you believe there is some compulsiveness present in Mr. Ramer's actions?

"A. Yes, I think that there is a tendency for him to repeat these irrational and anti-social acts that he has been involved in, and I think I see this as a type of compulsion.

"Q. Do you feel this is a type of mental ailment?

"A. I looked upon it as a character disorder, and to be more specific, a sociopathic.

"Q. What is that?

"A. A socio-pathic disorder is a character disorder.

"Q. Is that something that a layman would think of as a mental ailment?

MR. OBENOUR: "Objection.

THE COURT: "Sustained.

"Q. By Mr. Bingham: What was the term you last used, Doctor?

"A. Socio-pathic disorder.

"Q. What is a socio-pathic disorder?

"A. It is characterized by a person who has no conscience in the properly accepted sense of the term, a person who experiences very little anxiety, guilt or remorse, and a person who is unable to learn from experience or from punishment and a person who cannot delay gratification of his desires and impulses and has no concern for what consequences it might have to others, and it is a person who is unable to form any enduring emotional ties with others and a person who tends to blame others for his own insecurities.

"Q. And that is what you would characterize as Mr. Ramer's problem?

"A. Yes, this is the way I would characterize it, and socio-pathic individuals

In instructing the jury on the issue of insanity, the Court defined mental competence in the concept of the so-called *McNaughton Rule* as ameliorated by the "irresistible impulse" theory. The instruction as given is set out below.[8]

Appellant submitted requested instructions on this issue. The first requested instruction being essentially that known as the *Durham Rule* adopted by the District of Columbia Circuit. Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430.[9] Alternatively, appellant requested the instruction promulgated by the American Law Institute, in its Model Penal Code, Sec. 101.[10]

The District Judge rejected appellant's requested instructions. After the Court had completed its instructions to the jury, counsel for Ramer fully protected his record by objecting to the instruction given on the sanity issue and to the failure to give the requested instructions all as required by Rule 30, Federal Rules of Criminal Procedure.

With the foregoing background, we approach the determination of the issues presented on this appeal.

## IN CUSTODY INSPECTION OF APPELLANT'S MAIL

■ Appellant contends that the censorship by the prison authorities of correspondence between himself and his attorney effectively deprived him of the right to counsel as guaranteed by the Sixth Amendment to the United States Constitution.

Inspection of the appellant's mail was done strictly for security purposes. The mail was routinely examined for presence of contraband or plans for escape.

Note 7—Continued

characteristically have very poor impulse control.

"Q. Is this something that would ordinarily require psychiatric help or the help of a psychiatrist?

"A. These individuals have been treated psychiatrically. The treatment is difficult and prolonged and not uniformly successful.

"Q. But you would say treatment is desirable?

"A. If it is available, it is desirable."
" *  *  · *  "

8. "'Mental incompetence' as used in the instructions means such a perverted and deranged condition of mental and moral faculties as to render a person either incapable of distinguishing between right and wrong, or incapable of knowing the nature of the act he is committing, or even where a person is conscious of the nature of the act he is committing and is able to distinguish between right and wrong and knows that the act is wrong, yet his will—the governing power of his mind—has been so completely destroyed that his actions are not subject to it, but are beyond his control."

9. "If you, the jury, believe beyond a reasonable doubt that the defendant, Ramer, was not suffering from a disease of the mind at the time he committed the criminal act charged, if you find one to have been committed, you may find him guilty. If you believe that he was suffering from a disease of the mind, but believe beyond a reasonable doubt that at the time he committed the criminal conduct with which he is charged, or he possessed substantial capacity to conform his conduct to the requirements of the law, which he is alleged to have violated, you may find him guilty. Unless you believe beyond a reasonable doubt that Ramer was not suffering from a disease of the mind, or that despite that disease he possessed substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated, you must find him not guilty by reason of insanity. Thus, your task would not be completed upon finding, if you did find, that the accused suffered from a disease of the mind. He would still be responsible for his unlawful act if you found beyond a reasonable doubt that at the time he committed that act, the disease had not so weakened his capacity to conform his conduct to the requirements of the law which he is alleged to have violated that he lacked substantial capacity to conform his conduct to the requirement of the law. These questions must be determined by you from the facts which you find to be fairly deductible from the evidence in this case."

10. "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law."

The contents of the letters were never discussed with, or disclosed to, the prosecution authorities in this case. Mr. Brucker, appellant's original attorney, testified that he was hampered in his representation of Ramer by the mail surveillance, but the record discloses that he and his successor attorney had ample opportunity for private conferences with the appellant so as to prepare both for trial and for the pretrial motions. It was evident that both appellant and his lawyer were well aware of the mail surveillance policy and no material confidential matters were disclosed in the censored correspondence.

Research indicates that the precise question has been infrequently raised in reported cases. However, in the Eighth Circuit an appeal presenting practically identical facts with those before us were dealt with. Haas v. United States, 344 F.2d 56. There the Court, in holding without merit an identical specification of error, stated, at page 67:

"It well may be that a case of mail censorship could result in deprivation of the effective assistance of counsel in derogation of the Sixth Amendment. If, for example, the use of the mails constituted the only method whereby the defendant and his counsel could communicate with each other and such means of communication was censored, certainly the defendant then would have been deprived of his constitutional rights. We do not view the instant situation as comparable. Here defendant and his counsel were given every opportunity needed to communicate privately with each other during the ordinary visiting hours at the St. Louis City Jail. The opening by the City Jail officials of mail between defendant and his counsel, done for security purposes, and the contents thereof not communicated to the prosecution, presents an entirely different situation."

We are convinced of the soundness of the Haas reasoning. Cases relied on by the appellant such as Caldwell v. United States (1953), 92 U.S.App.D.C. 355, 205 F.2d 879 and Coplon v. United States (1950), 89 U.S.App.D.C. 103, 191 F.2d 749, are not in point as they deal with "surreptitious interception" or secret and deliberate eavesdropping by the prosecution on matters concerning the defense. Such is not the case here. The trial court, after an evidentiary hearing, found that the defendant was not deprived of effective assistance of counsel. This finding not only is not clearly erroneous, but is fully supported by the record. It was not error to deny the motion to dismiss the indictment on this ground.

## ADMISSION OF TESTIMONY OF PRISON MEDICAL DOCTORS

The thrust of appellant's arguments against the admissibility of the testimony of Dr. Kyle, the prison medical officer, and Dr. Johnston, the consulting psychiatrist, is threefold:

1. That the examinations by the doctors were in effect in custody interrogations, by police officials, under circumstances where the appellant was under arrest, on a charge of escape, and was not advised of his right to remain silent and to have counsel.

2. That failure to follow the procedures for determining mental competency of one under arrest as provided in 18 U.S.C. § 4244 made the evidence of Dr. Johnston inadmissible.

3. That a relationship of physician and patient existed at the time of the examination by Dr. Johnston and that on timely objection his testimony was inadmissible as violative of the physician-patient privilege.

We find the specifications of error based on the foregoing grounds to be without merit and deal with each in the order stated.

That the appellant was, on the occasion of each of the two examinations, by the respective doctors, in custody, standing accused of the instant offense and not specifically advised of his constitutional rights must be conceded.

On this basis we are told that the teachings of *Miranda* [11] require that the testimony of the Doctors regarding the examination of Ramer must be held inadmissible as violative of the constitutional safeguard against self incrimination. We are unable to agree.

We need not decide the question of the admissibility of evidence concerning any exculpatory or inculpatory statements of the appellant made to the Doctors as no evidence of such statements was offered.

Dr. Kyle, as prison physician, gave the appellant a physical examination immediately after his reapprehension for the purpose of determining if any medical treatment was required. Ramer had, at that time, been subjected to outdoor exposure in rather cold weather for about five to six days. The examination was routine and in the interest of the welfare of the patient. Dr. Kyle's testimony at the trial was limited solely to a general description of the examination he made, and to the fact that the appellant's feet appeared reddened, and that he seemed "mentally competent". He was thus allowed to testify only to his observations of the appellant.

Dr. Johnston saw Ramer a few weeks after the escape, made a usual and routine psychiatric examination to determine his mental competency. His testimony was limited to his opinion of the sanity of the patient as of the date of the offense charged. With commendable caution the trial judge made certain that the Doctor did not repeat any statements of the accused relative to the escape matter.

■ No case has been cited to us where prison physicians, having made routine examinations of prisoners, were excluded from testifying as to their observations of the prisoner and his condition on the ground that such testimony violated the prisoner's constitutional guarantee against self-incrimination. Our research has failed to disclose any case law precedent on the question. As indicated, appellant relies on the teaching of the *Miranda* case and the cases leading up to that decision by the United States Supreme Court. We are unwilling to expand the mandate of *Miranda* to the extent sought by the appellant. The admission of the testimony of Doctors Kyle and Johnston was not erroneous under this specification of error.

■ Next appellant would exclude the psychiatric opinion of Dr. Johnston for the reason that the statutory procedure set out in 18 U.S.C. § 4244 was not followed. Section 4244 provides for post arrest, mental examinations of accused persons where the United States Attorney, or the Court, has reason to suspect that the accused may be insane or otherwise mentally incompetent. Alternatively an accused may request the mental examination. Under the procedure provided in this legislative enactment a court order is entered requiring a psychiatric examination and designating the examiner or examiners. A judicial finding on the question of competency follows. Statements of the accused made during such examination are not admissible in evidence against him on the issue of guilt in any criminal proceeding. Nowhere in the legislative history or in the court construction of this statute do we find any support for appellant's position. Here the prison doctor was of the opinion that Ramer was mentally competent but asked for a routine psychiatric examination to get a further opinion on mental competence as well as to determine if any additional treatment appeared to be called for. There is no indication that the United States Attorney believed or had cause to believe that the appellant was insane or otherwise mentally incompetent. The appellant had not asked for an examination and the matter had not at that time been presented to the Court. No basis for the application of Section 4244 proceedings existed. The appellant has cited no authority for his contention and we have found none. Under the existing circumstances, the testimony of the psychiatrist was not inadmissible because

11. See Footnote 3, supra.

not ordered under the provisions of Section 4244.

The third reason advanced as a bar to the testimony of Dr. Johnston is based on the contention that a physician-patient relationship existed and that communications between the Doctor and the patient were privileged and inadmissible as evidence.

The common law did not recognize as privileged the communications between physician and patient. Aetna Life Insurance Company v. Gordy, (8 Cir., 1957) 248 F.2d 129, 97 C.J.S. Witnesses § 293, p. 824. In many state jurisdictions a statutory privilege has been created. The State of Washington provides for such a physician-patient privilege as a statutory evidentiary rule. Revised Code of Washington, § 5.60.060(4). Congress has not adopted any statute of general federal application in this field.

Rule 26, Federal Rules of Criminal Procedure, provides in part:

"* * * The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

■ Federal rather than state law furnishes the standard governing admissibility of evidence in a federal court. United States v. Krol, (C.A. 7, 1967) 374 F.2d 776, certiorari denied 389 U.S. 835, 88 S.Ct. 46, 19 L.Ed.2d 97.

■ It appears to have been tacitly assumed by each party (and by the Court) in the instant case that the privilege existed as a rule of evidence and that only the question of applicability was presented. We will therefore examine the question in that posture.

Appellant principally relies on the holding of the District of Columbia Cir-

cuit in Taylor v. United States, 95 U.S. App.D.C. 373, 222 F.2d 398.[12] In that case the accused, Taylor, was indicted for robbery. A competency hearing under the provisions of 18 U.S.C. § 4244 resulted in a finding of incompetence and a commitment to St. Elizabeth's Hospital, the District of Columbia mental institution. Seven months later Taylor was certified competent to stand trial wherein he raised the defense of insanity. A staff psychiatrist from St. Elizabeth's was called as a prosecution witness. Actually the doctor himself first suggested that his testimony might be privileged, but the Court ruled that it was not. The Circuit Court held this was error and reversed.

In the review of Taylor, the appellate court held that the staff psychiatrist, Dr. Epstein, had treated the defendant as a patient. In summary of the evidence on this score, the Court said, at page 402:

"Obviously Dr. Epstein attended Taylor 'in a professional capacity'. Obviously he succeeded in getting his patient's confidence. He tried to respect it as the District of Columbia statute requires. The court erred in requiring him to violate it."

In analyzing the Taylor case, it is further important to note that Dr. Epstein had testified to specific incriminating statements made to him by the accused during the course of treatment.

Appellee contends that not only is Taylor distinguishable on the facts, but that the case supports the government's position. The United States Attorney points out that the Court at page 402 recognized: "that a doctor who does not treat a prisoner, but only examines him in order to testify about his condition, may testify about it." Under such circumstances the Court further said, again at page 402: "Examination for testimonial purposes only has nothing to do with treatment. A doctor who makes such an

12. We note in passing that at the time Taylor was decided, District of Columbia Code, 1951 § 14–308, provided for a statutory privilege as to communications between physician and patient.

examination is not 'attending a patient'. There is no confidential relation between them.". Appellee points out that in the case here on appeal there was no treatment by the Doctor, only a single examination. The examination was made routinely to determine the mental competence of the prisoner recently returned as an escapee. This information was needed to determine the scope of custodial problems as well as to establish evidence concerning the mental competence of the escapee in the event of subsequent prosecution for the offense at which time the question of sanity might be raised as a defense.

The trial court, after a full voir dire hearing, which included testimony of both Dr. Johnston and of the purported patient Ramer, concluded that the examination by Dr. Johnston was not within the physician-patient privilege and that evidence of the Doctor's opinion as to mental competency was admissible. At the same time he totally barred any evidence by the Doctor concerning statements made to him by Ramer in the course of the examination concerning the facts of the alleged escape.

Under all of the circumstances we think this ruling is not at odds with the holding of the Washington, D. C. Circuit. No other precedents more favorable to the appellant have been cited to us. We are of the opinion that it was not error to admit Dr. Johnston's testimony over the objection that it represented a privileged communication.

### INSTRUCTION ON TEST OF MENTAL COMPETENCE

Appellant relied on the defense of insanity and contends that the Court erroneously instructed the jury on the appropriate test of mental competence.

The instruction to the jury as given by the Court as well as the two instructions requested by the defense and re-jected by the Court have been heretofore set out in full in footnotes (8), (9) and (10), supra.

The trial court instructed on the issue of insanity in substantially the language heretofore approved by this Court. Andersen v. United States (1956), 237 F.2d 118; Sauer v. United States (1957), 241 F.2d 640; Maxwell v. United States (1966), 368 F.2d 735. The instruction as given follows the so-called "McNaughton Rule" and encompasses the "right from wrong", "nature of the act" and the "uncontrollable act" tests. This definition of insanity for the purpose of determining criminal responsibility has been thought to carry the stamp of approval of the United States Supreme Court since before the turn of the century. Davis v. United States (1897), 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750; [13] Matheson v. United States (1913), 227 U.S. 540, 33 S.Ct. 355, 57 L.Ed. 631. Appellant objected to the Court's instruction and urged that the Court adopt one of the other of appellant's proposed instructions. The first of these instructions urged that the Court follow the District of Columbia Circuit lead and adopt the so-called "Durham Rule". Durham v. United States (1954), 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430. In essence, under *Durham*, criminal responsibility is absent if the unlawful conduct was the product of mental disease or defect.

The announcement of the *Durham* holding in 1954 had a profound effect on the federal courts of the United States. It had been generally felt that until the Supreme Court receded from the *Davis II* holding the circuit courts were powerless to change the rule. The District of Columbia Court apparently had no such feeling as the *Davis II* case is not alluded to in the reported opinion. The Court merely found the old right and wrong test and the irresistible impulse test to be outmoded in the light of modern day

---

13. This is sometimes called *Davis II* as differentiated from *Davis I*, Davis v. United States (1895), 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499. *Davis I* involved the same individual and was a prior appeal of the same case as that reported in *Davis II.*

scientific knowledge. The gist of the *Durham* Court's feeling and the simple rule proposed are found in this excerpt from the opinion, at page 874:

"We find that as an exclusive criterion the right-wrong test is inadequate in that (a) it does not take sufficient account of psychic realities and scientific knowledge, and (b) it *is* based upon one symptom and so cannot validly be applied in all circumstances. We find that the 'irresistible impulse' test is also inadequate in that it gives no recognition to mental illness characterized by brooding and reflection and so relegates acts caused by such illness to the application of the inadequate right-wrong test. We conclude that a broader test should be adopted.

"In the District of Columbia, the formulation of tests of criminal responsibility is entrusted to the courts and, in adopting a new test, we invoke our inherent power to make the change prospectively.

"The rule we now hold must be applied on the retrial of this case and in future cases is not unlike that followed by the New Hampshire court since 1870. It is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect."

In 1961, the Third Circuit abondoned the right and wrong test of *McNaughton* and adopted a modified version of the *Durham Rule*. United States v. Currens, 290 F.2d 751. In 1963, the Tenth Circuit formulated a rule for the instruction to be used in that Circuit partially embodying the *Durham* concept. Wion v. United States, 10 Cir., 325 F.2d 420.

As indicated, counsel for Ramer requested, as an alternative to the *Durham* type instruction, the form of instruction suggested by the American Law Institute. This instruction embodies the theory that criminal responsibility is absent where the accused "lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law."

Since the District of Columbia Circuit made the original break-through, a number of circuits have now adopted the A.L.I. model instruction, or a modified version thereof. United States v. Freeman (C.A. 2, 1966), 357 F.2d 606; United States v. Shapiro (C.A. 7, 1967), 383 F.2d 680; United States v. Smith (C.A. 6, 1968), 404 F.2d 720.

Approximately half of the circuits have now found the old test as exemplified by the *McNaughton Rule* to be obsolete. Appellant urged the trial court to abandon the old and don the new. The learned district judge, properly very aware of the holdings of this Court in *Andersen, Sauer* and *Maxwell* refused the invitation to break new ground. Requested instructions were rejected and the jury instructed on the issue of mental competence in accordance with the definition approved by this circuit.

As heretofore indicated, during the course of the trial a psychiatric expert was called by each party. As may be seen from the footnote and excerpts of testimony, the evidence of these experts was remarkably similar. Each testified that Ramer was sane at the time of his escape. No evidence contravenes these opinions. It is patent that the doctors measured sanity by the "right from wrong" rule. They agreed that he understood the nature of his acts and was aware that what he was doing was wrong. The psychiatrists generally shared the opinion that appellant suffered from a character disorder which was usually manifested by "poor impulse control".

It is in this area of impaired ability to control his impulses that the medical evidence most favorable to Ramer's defense is to be found. While they were quite guarded about it, the doctors did give some indication that appellant, in following his impulsive conduct, was subject to a degree of compulsion to so act. Dr. Johnston indicated that Ramer "consistently has the ability to know right from wrong, but the impulse overwhelms this". Dr. Stubbs, for the defense, ventured

that "There is an element of compulsion" and "I think I see this as a type of compulsion".

 There was then evidence before the jury from which it might have been concluded that, while the appellant knew right from wrong and understood the nature of his act, he still, because of the condition of his mind, committed acts which were beyond his control, i. e., were uncontrollable acts. Appellant was entitled to have the jury correctly instructed on this theory of his defense. It was to comply with this requirement that the court gave the heretofore quoted instruction. This Court has previously held that this instruction embodies, in its definition of insanity, the "uncontrollable act" test. Maxwell v. United States, supra. Under the precedential authorities controlling, the trial judge properly and correctly instructed the jury on the test for mental culpability. Additionally, on the evidence presented, the instruction given was as favorable to the appellant as he was entitled.

Unless we are prepared to adopt a new rule for this jurisdiction, there appears to be no ground for reversal based on the definition of insanity used by the trial court.

Four times in the last two years this Court has been asked to reconsider the *Andersen* and *Sauer* holdings. In *Maxwell*, supra, a panel of the Court said, 368 F.2d at page 743:

> "It may be that, sooner or later, this court will again wish to review this general problem, last examined at length in the *Sauer* case, decided in 1957. However, we do not believe this should be done in a case such as this, where the evidence as to any insanity was extremely meager, and where no perceivable prejudice resulted from failure to give an instruction more in keeping with the A.L.I. formulation."

In Ramer v. United States, supra, footnote (1), the case of this appellant was before this Court, sitting en banc. Combined with the *Ramer* case before the en banc hearing was a second case entitled Church v. United States, reported in the *Ramer* decision. This time the entire Court, with four members dissenting, refused to re-examine the *Sauer* holding. Though the dissenting opinion, authored by Judge Hamley, is a cogent resume of the innovations adopted by other courts, and an eloquently powerful argument for change, the majority was not persuaded. Again, in Oliver v. United States (9 Cir., 1968), 396 F.2d 434, the Court refused an en banc re-examination of *Sauer*.

Most recently, another panel of this Court rejected an entreaty to depart from the established policy of adhering to the modified *McNaughton Rule*. Johnson v. United States, 9 Cir., 406 F.2d 1111 (1969). Accordingly, *Sauer* remains the controlling authority in this circuit.

The entire record of this cause reflects that the appellant was fairly tried and that no reversible error was committed. Accordingly we affirm.