UNITED STATES of America, Plaintiff,

v.

Laurence John LAYTON, Defendant.

No. CR–80–416–RFP.

United States District Court,
N. D. California.

May 8, 1981.

G. William Hunter, U. S. Atty., Stanford Svetcov, Robert L. Dondero, Asst. U. S. Attys., San Francisco, Cal., for plaintiff U.S.

James F. Hewitt, Federal Public Defender, Frank O. Bell, Jr., Chief Asst. Federal Public Defender, Tony Tamburello, San Francisco, Cal., for defendant Laurence John Layton.

## MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF SUKHDEO TAPES

PECKHAM, Chief Judge.

The government seeks to compel defendant to produce tapes made of conversations between himself and Dr. Hardat Sukhdeo. Because we find no authority to compel pretrial disclosure of these materials, and, further, because the materials which the government seeks are privileged under the attorney-client privilege, we deny the government's motion to compel discovery.

### FACTS

Dr. Sukhdeo is the Chief of Psychiatry at Jersey Medical School in New Jersey. According to his declaration, he travelled to Guyana after the Jonestown tragedy because he has had extensive experience with cults and felt that he might be of some help to the survivors. Also, Dr. Sukhdeo is Guyanese by birth and he believed that his familiarity with Guyanese culture and government might be of use. Dr. Sukhdeo offered his assistance to the F.B.I. He does not seem, however, to have made any general offer to assist in the F.B.I.'s investigation, but rather to have offered aid in coping with the suicidal feelings of the survivors and in predicting the actions of certain surviving members of the Peoples Temple who might pose a threat to defectors. On a number of occasions, Dr. Sukhdeo met with F.B.I. agents to discuss his concerns, but at no time did they "retain" him to assist in their investigation of this case or in the prosecution of the defendant. Under a grant from the National Institute of Mental Health, Dr. Sukhdeo began treating some of the survivors, not including the defendant.

In early 1979, Tony Tamburello, a defense counsel in this case, retained Dr. Sukhdeo, primarily to treat Layton, and secondarily to advise him and Layton's Guyanese attor-

neys in relation to charges that might be filed against Layton in Guyana or elsewhere. After this time, all fees and expenses in relation to Dr. Sukhdeo's treatment of Mr. Layton were paid by Layton's family. It was after this time that Sukhdeo interviewed Layton on several occasions. Some of these interviews were taped, and these tapes are now in defense counsel's possession. According to Dr. Sukhdeo's declaration, he met with F.B.I. agents on a few occasions even after he was retained by Mr. Tamburello. He continued to offer his assistance in dealing with Peoples Temple survivors, and also met with F.B.I. agents to ask to hear the "Last Hour Tape." He states that at no time during these meetings did he disclose any confidential communications between himself and Layton.

Sukhdeo testified at Layton's trial in Guyana. Most of his testimony concerned cults in general and observations about conditions at Jonestown. It is unclear whether these observations derived from Sukhdeo's conversations with Layton or from his independent investigation. The only specific references to Layton's mental state concern his loss of memory at the Port Kaituma airstrip. Sukhdeo testified, in substance, that Layton's hysterical personality, combined with his hypochondriacal tendencies, his fear, and the fact that he had taken several Elavil tablets, could have caused him to lose his memory. Although it is likely that these observations derived from conversations with the defendant, there is no reference to any such conversations. Further, this portion of Dr. Sukhdeo's testimony is quite brief and very general.

Neither the government nor the defense plans to call Dr. Sukhdeo or to introduce the tapes into evidence. The government seeks production of the tapes because it believes that they will be very useful to their own experts as they prepare for trial.

## DISCUSSION

*A. There is no authority for compelling production of the tapes.*

The government urges that, under Rule 16(b)(1)(B), which provides for the discovery of scientific reports, under Rule 16(c), which the government claims provides for reciprocal discovery, or simply under a general rule of reason and fair play, this court has authority to compel production of the tapes. We do not agree.

■ Rule 16(b)(1)(B) provides that the government may discover "results and reports of physical or mental examinations ... which the defendant intends to introduce as evidence in his case in chief or which were prepared by a witness whom the defendant intends to call." For two reasons, this rule does not apply to the tapes in question. First, the defendant does not intend to call Dr. Sukhdeo in his case in chief, nor to introduce the tapes into evidence. Second, these bare tapes of psychiatric interviews cannot be considered "results or reports" of a mental examination. Rather, they are the raw material upon which a result or report—if Dr. Sukhdeo were to prepare one—would be based.

■ The government also argues generally that, in the interests of fair play and necessity, courts are liberal in permitting discovery of psychiatric evidence when, as here, a defendant asserts a psychiatric defense. The cases the government relies upon, however, all involve materials which fall within the ambit of Rule 16. For example, in *U.S. v. Ives*, 609 F.2d 930, 932 (9th Cir. 1978), the trial court had refused to order the government to produce psychiatric reports material to a psychiatric defense, *and otherwise clearly discoverable*, on the ground that the reports were too remote. The Ninth Circuit found that remoteness was too technical a reason to deny production of evidence relevant to a defendant's mental condition where his mental condition is in issue.

■ The government urges that a court has "inherent power" to compel production of evidence needed either by the prosecution or the defense. This argument rests on *U.S. v. Nobles*, 422 U.S. 225, 230–32, 95 S.Ct. 2160, 2166–67, 45 L.Ed.2d 141 (1974), a

case which is quite distinguishable.[1] In that case, defendant sought to impeach two eyewitnesses by introducing their prior inconsistent statements, recorded in a report made by a defense-retained investigator who had interviewed the witnesses. The Supreme Court held that it was proper for the district court to compel production of the report *after defense counsel had attempted to use it to refresh the witnesses' memory.* Hence, the case did not concern *pretrial* discovery under Rule 16. Instead, it was simply an application of well-settled rules that a witness must be given an adequate opportunity to explain or deny prior inconsistent statements, and that the opponent has a right to examine documents that are used to refresh memory. In short, there is no authority for the proposition that a court has inherent authority to compel a defendant to provide pretrial discovery which is not specifically authorized in Rule 16.

Moreover, we do not believe that requiring such discovery would further any of the policies which are served by requiring production of psychiatric reports under Rule 16(b)(1)(B). The advisory committee note to that subsection states simply that "it is important for the prosecution to be able to study the results reached by defense experts which are to be called," presumably so that they can impeach those experts. The notes do not in any way suggest that the Rule was intended to authorize compelled discovery simply to assist prosecution experts in preparing for trial. The government contends that Dr. Sukhdeo's nearly contemporaneous interviews with Layton would provide the best evidence of Layton's mental state at the time of the charged offenses. Although it would not introduce the tapes into evidence (and will not need them to impeach Dr. Sukhdeo, who will not testify), the government feels it needs the tapes to provide its own experts with background information. We do not believe that this non-evidentiary use of the tapes furthers any interest which is important enough to justify invoking any inherent authority which may exist to compel discovery. Moreover, even if this court would otherwise invoke such inherent authority, we believe that the government's interest in production is too slight to overcome the defendant's interest in nondisclosure. As explained below, the Sukhdeo tapes are privileged. Even if they were not privileged, the defendant has at stake significant privacy interests which would have to be weighed against the government's need for disclosure, before this court could decide to invoke any inherent power to compel discovery.[2]

1. The government also relies on broad language advocating liberal discovery in *U.S. v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974). That case, however, involved a Rule 17 subpoena to a third party, not Rule 16 discovery from the defendant or his attorney or attorney's agent. The drafters of Rule 16 evidently believed that our adversary system, fifth amendment considerations, and other deeply-rooted policies which disfavor devices which force a defendant to lighten the prosecution's burden of proof, demanded that discovery from a criminal defendant be limited by more than the Rule 17 requirements of materiality and relevance. The dictum in *U.S. v. Nixon, supra,* is therefore irrelevant to the situation before us.

2. The government also contends that Rule 16(c)'s "reciprocal discovery" provision authorizes this court to compel production of the tapes because the government has already volunteered extensive materials to the defense. However, the "reciprocal discovery" provision has been repealed and, in any case, would not have applied to the instant situation. Before 1975, Rule 16(c) provided that if the court granted a defense motion for discovery, it could condition the order by requiring that the defendant produce certain tangible objects which he intended to use at trial. This would seem to contemplate contemporaneous, court-ordered discovery, rather than voluntary production by the government followed by a motion for court-ordered discovery. *See U.S. v. Milano,* 443 F.2d 1022, 1027 (10th Cir., 1971); *contra, U.S. v. Estremera,* 531 F.2d 1103, 1112–13 (2d Cir., 1976). Further, old rule 16(c) only applied to materials which the defendant intended to introduce in his case-in-chief, and, as noted above, the defense does not intend to introduce the Sukhdeo tapes.

The government's reliance on this repealed subsection of Rule 16(c) suggests that they believe courts have inherent power to invoke a doctrine of "reciprocal discovery" which is still vital and which was merely represented by the old rule. There is no authority for this proposition. We note, moreover, that the deletion of

Even if a broad interpretation of some provision of Rule 16 would otherwise authorize the order which the government seeks, Rule 16(b)(2) would preclude its issuance. That section provides:

> Except as to scientific or medical reports, this subdivision does not authorize the discovery or inspection of reports, memoranda, or other internal defense documents made by the defendant, or his attorneys or agents in connection with the investigation or defense of the case, *or of statements made by the defendant,* or by government or defense witnesses . . . to the defendant, his agents, or attorneys." [Emphasis added.]

Since, as explained above, Dr. Sukhdeo's tapes do not constitute a scientific or medical report within the meaning of Rule 16(b)(1)(B), they must be considered "statements made by the defendant . . . to his agent [in connection with his defense]."

For all these reasons, the government's motion must be denied.

### B. Privileges.

Since we find no authority to compel production of the tapes, we need not reach the question of privilege at all. Several fundamental privileges, however, provide independent grounds for our denial of the instant motion. Defendant asserts three privileges: (1) attorney-client; (2) psychotherapist-patient; and (3) fifth amendment-self-incrimination.

#### 1. The attorney-client privilege.

The government claims that, as late as April 24, 1979, Dr. Sukhdeo was still offering assistance to the F.B.I. and that he represented to the F.B.I. that he was acting "on his own" in treating Peoples Temple members. Sukhdeo's declaration, however, states that he was retained by Mr. Tamburello in early 1979, before making any tapes of interviews with Mr. Layton. He is, of course, the only person (other than Mr.

Tamburello) who has personal knowledge as to when he was retained by Tamburello. We therefore find no reason to disbelieve his declaration. Indeed, his and the government's statements are not inconsistent. It appears that Sukhdeo, even after he was retained to assist in Layton's defense, still wished to help the F.B.I. deal with other survivors. Sukhdeo also states that his interviews with survivors other than Layton were undertaken on his own. Thus, he does not contradict the government's allegations.

Under the circumstances described in Dr. Sukhdeo's declaration, the tapes were made at least partly for the purpose of obtaining legal advice and are therefore protected by the attorney-client privilege. *See U.S. v. Palmer*, 536 F.2d 1278, 1281 (9th Cir. 1976); *U.S. v. Gurtner*, 474 F.2d 297, 298 (9th Cir. 1973); *U.S. v. Alvarez*, 519 F.2d 1036 (3d Cir. 1973). In addition to the communications themselves, documents prepared by counsel or his agent and, as here, "leading irresistably" to the disclosure of confidential communications are also protected. *See Matter of Fischel*, 557 F.2d 209, 212 (9th Cir. 1977).

The government cites *U.S. v. Carr*, 437 F.2d 662, 663 (D.C.Cir.1970) for the proposition that the attorney-client privilege cannot be used to shield psychotherapist-patient communications when a defendant has placed his mental state in issue. *Carr*, however, did not reach this point. *Carr* holds that the need to explore all psychiatric evidence overrides the psychotherapist-patient privilege when the defendant asserts a psychiatric defense but only suggests that the same rule applies to the attorney-client privilege. The *Carr* court did not view the attorney-client privilege as controlling because the defense-retained expert had immediately turned over his findings to the government.

Although some commentators have strongly endorsed the view that the attorney-client privilege, like the psychothera-

---

pist-patient privilege, should not be used to shield therapist-patient communications when mental state is in issue, *see* Saltzburg, *Privileges and Professionals: Lawyers and Psychiatrists*, 66 Va.L.Rev. 597 (1980), this is by no means the settled rule. In fact, the one federal case considering the question expressly rejected this view. *U.S. v. Alvarez, supra.* Any other rule would mean that a defendant contemplating a psychiatric defense must run the risk that a psychiatrist he hired to advise him with respect to his mental state would be forced to be a government witness. Another federal court reluctantly rejected a challenge to a state conviction based in part on the testimony of a defense-retained doctor. *U.S. ex rel. Edney v. Smith*, 425 F.Supp. 1038 (E.D. N.Y.1976), *affirmed*, 556 F.2d 556 (2d Cir.), *cert. denied*, 431 U.S. 958, 97 S.Ct. 2683, 53 L.Ed.2d 276 (1977). Although Judge Weinstein sharply disagreed with the state court's view that the attorney-client as well as the psychotherapist-patient privilege was waived when a defendant put his mental state in issue, *see id.* at 1053, he was unable to hold that the view was unconstitutional. Most of the states, moreover, have treated the attorney-client privilege more favorably, and have protected communications to defense-retained psychotherapists. *See, e. g., State v. Pratt*, 284 Md. 516, 398 A.2d 421 (1979); *People v. Lines*, 13 Cal.3d 500, 119 Cal.Rptr. 225, 531 P.2d 793 (1975); *People v. Hilliker*, 29 Mich.App. 543, 185 N.W.2d 831 (1971); *State v. Kociolek*, 23 N.J. 400, 129 A.2d 417 (1957). We therefore conclude that, even if the psychotherapist-patient privilege is made inapplicable by defendant's assertion of a psychiatric defense, the attorney-client privilege shields these communications.

■ The government also contends that any attorney-client privilege (as well as any other applicable privilege) was waived when Dr. Sukhdeo was called as a defense witness in Guyana. As explained above, however, Dr. Sukhdeo did not testify directly as to any communications he had with the defendant. For the most part, his testimony concerned very general observations which could well have derived from Dr. Sukhdeo's experience or an independent inquiry. Even the few and very broad observations about Layton's own personality could as easily have resulted from conversations with people other than Layton as from confidential interviews. Supreme Court Advisory Standard Number 511, concerning waiver of privileges by voluntary disclosure, emphasizes that "a significant part of the matter or communication" must be disclosed before any waiver occurs. A specific communication must be revealed before there can be any waiver. We find no such disclosure and, consequently, no waiver.[3]

### 2. The psychotherapist-patient privilege.

■ For two important reasons, the psychotherapist-patient privilege is inapplicable. First, in federal courts privileges are defined by reference to the common law. See Fed.Rule Evid. 501. The federal courts have universally recognized that no such privilege existed at common law and that therefore does not exist in federal courts. *U. S. v. Meagher*, 531 F.2d 752, 753 (5th Cir.), *cert. denied*, 429 U.S. 853, 97 S.Ct. 146, 50 L.Ed.2d 128 (1976); *In Re Grand Jury Subpoena*, 460 F.Supp. 150, 151 (W.D.Mo. 1978); *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 877 fn. 28, 51 L.Ed.2d 64 (1977). Second, in those states where this privilege is provided by statute, it is the universal rule that the privilege does not apply when

3. The government also complains that Sukhdeo promised to deliver the tapes to government attorneys and then, instead, delivered them to Mr. Layton's attorneys. The government does not explain why these facts, if true, would have any bearing on the instant motion. Since it is disclosure, not a promise to disclose, which waives the privilege, and since Dr. Sukhdeo's promise could not do so in any case because not he but Mr. Layton is holder of the privilege, such a broken promise could not have operated to vitiate any privilege. Moreover, Dr. Sukhdeo states that he never promised to give the tapes to the government but only mentioned that he would have them with him when he came to San Francisco. He did bring the tapes to San Francisco but gave them to Mr. Tamburello. Since Dr. Sukhdeo considered himself to be retained by Mr. Tamburello, it seems quite reasonable that he would do so.

the patient has placed his mental state in issue. California Evidence Code § 1016 is typical in this respect. *See also, People v. Lines*, 13 Cal.3d 500, 512, 119 Cal.Rptr. 225, 531 P.2d 793 (1975).

 Federal courts have, however, recognized that the decision to see a psychiatrist falls within a "cluster of constitutionally protected choices," and that therapy will usually be seriously jeopardized by the lack of any guarantee of confidentiality. *See Hawaii Psychiatric Society v. Ariyoshi*, 481 F.Supp. 1028, 1038 (D.Haw.1979); *Ramer v. U.S.*, 411 F.2d 30, 39–40 (9th Cir. 1969). These cases suggest that the patient's very strong privacy interest should be weighed against the need for disclosure and that unnecessary disclosures should be avoided. As explained above, we believe that this privacy interest must also be given great weight in the decision whether to invoke any inherent authority to compel discovery which is not specifically authorized by Rule 16. In this case, we do not believe that the government's need for the tapes is as weighty as defendant's competing privacy interest. While it is certainly true that recordings of interviews held soon after the events in question would be a boon to the government's psychiatrists, an able psychiatrist ought to be able to reach conclusions about Mr. Layton's mental state during those events without the aid of these recordings. Indeed, it is a rare case in which either the government or the defense would have the benefit of this kind of material. We therefore believe that the significant privacy interest at stake here would, alone, outweigh the government's need for pretrial disclosure, and would therefore be sufficient reason to deny the order which the government seeks.

In view of the foregoing conclusions that there is no authority to issue the order which the government seeks, and that, in any case, the materials sought are privileged under the attorney-client privilege, we find it unnecessary to determine whether these materials would also be privileged under the fifth amendment.

For these reasons, the government's motion to compel production of the Sukhdeo tapes is DENIED.