UNITED STATES of America,

v.

**Dean Anthony BECKFORD, Claude Gerald Dennis, Leonel Romeo Cazaco, and Richard Anthony Thomas.**

**Criminal Nos. 3:96CR66–01, 3:96CR66–05, 3:96CR66–06, and 3:96CR66–07.**

United States District Court,
E.D. Virginia,
Richmond Division.

March 28, 1997.

---

David Novak, Stephen Miller, Andrew McBridge, Asst. U.S. Attys., Richmond, VA, for U.S.

Gerald T. Zerkin, Robert J. Wagner, Richmond, VA, for Dean Beckford.

John C. Jones, Quinton, VA, Scott Brettschneider, Kew Gardens, NY, for Claude Dennis.

Reginald M. Barley, Richmond, VA, Cary B. Bowen, Bowen & Bowen, Richmond, VA, for Leonel Cazaco.

David P. Baugh, Richmond, VA, Elizabeth D. Scher, Morchower, Luxton & Whaley, Richmond, VA, for Richard Thomas.

## MEMORANDUM OPINION

PAYNE, District Judge.

Defendants Dean Anthony Beckford, Claude Gerald Dennis, Leonel Romeo Cazaco, and Richard Anthony Thomas have been charged in the Superseding Indictment with intentional murder in furtherance of a Continuing Criminal Enterprise in violation of 21 U.S.C. § 848(e). Pursuant to 21 U.S.C. § 848(h), the Government has notified each defendant that it intends to seek a penalty of death in the event of conviction and has posited with specificity the statutory and non-statutory aggravating factors which it will seek to prove as the basis for imposition of the death penalty. This is, then, a capital case under Section 848(e).

The Government has filed a Motion For Notice and Reciprocal Discovery of Mental Health Defenses to be Raised at Either the Guilt or Penalty Phases of the Trial ("Government's Motion") Therein, the Government moves for entry of an order:

(1) requiring any defendant who intends to introduce evidence of his mental health or capacity at any phase of the trial to file a notice of intent by a date certain and therein to specify:

(a) the nature of the proffered mental condition or defect and the date of its onset;

(b) the identity and qualifications of the mental health experts who will testify or whose opinions will be relied upon; and

(c) a summary of the diagnosis or diagnoses of said mental health experts and a summary of the basis for their opinions;

(2) requiring that any examination of the defendant undertaken by a defense expert, whether at government expense or otherwise, be properly recorded by videotape, audiotape, and/or stenography so that the Government and its experts may have adequate opportunity to evaluate the accuracy of said examination and prepare a rebuttal to the mental health evidence offered by the defendant;

(3) requiring any defendant who gives notice of intent to raise a mental health defense to submit to examination by an expert or experts of the Government's choosing;

(4) requiring the defense to provide the Government with any and all materials that form the basis of the defense expert's opinion; and

(5) ordering the defendants to comply with the reciprocal discovery obligations set forth in Federal Rules of Criminal Procedure 12.2 and 16(b) by a date certain set by this Court.

For the reasons set forth below, the Government's Motion is granted in part and denied in part.

## BACKGROUND

The mental health and mental capacity of a capital defendant is relevant to a sentencing proceeding under 21 U.S.C. § 848 in several respects. First, at least three statutory mitigating factors may implicate the defendant's mental health or capacities, either at the time of the offense or at the time of sentencing. *See, e.g.* Section 848(m)(1) ("[t]he defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of the law was significantly impaired"); Section 848(m)(7) ("[t]he defendant committed the offense under severe mental or emotional disturbance"); and Section 848(m)(10) ("[t]hat other factors in the defendant's background or character mitigate against imposition of the death sentence"). Second, Section 848(1) provides that "a sentence of death shall not be carried out upon a person who is mentally retarded." This provision constitutes a legal bar to imposition of capital punishment on a certain class of defendants based on mental status.

Thus, the controlling statute affords a death-eligible defendant several opportunities to rely on his mental health or condition to oppose imposition of the death penalty. Section 848 also explicitly provides that the Government "shall be permitted to rebut any information received at the hearing and shall be given a fair opportunity to present argument as to the adequacy of the information to establish the existence of any of the ... mitigating factors ..." 21 U.S.C. § 848(j).[1]

The Government anticipates that, if Beckford, Dennis, Cazaco, and Thomas are convicted of capital charges, they will introduce expert testimony respecting their mental condition during the penalty phase of the trial to support reliance on some, or perhaps all, of the statutory mitigating factors summarized above. The Government also apprehends, based on statements made by counsel for Cazaco, that Thomas may raise the bar of Section 848(1). The Government asserts that it can meaningfully rebut this expected evidence only by offering the testimony of its experts after those experts are permitted to examine the defendants. Defendants respond that there is no statutory or other authority permitting a court to order an independent mental examination for the penalty phase of a capital trial, and that any such examination would violate the Fifth Amendment privilege against self-incrimination.

---

1. Under the statute, any one juror may find the existence of any mitigating factor by a preponderance of the evidence while the government must prove the existence of aggravating factors to the satisfaction of a unanimous jury beyond a reasonable doubt. 21 U.S.C. § 848(k).

## DISCUSSION

The Government's Motion and the positions taken by the defendants raise several issues of significance. Resolution of those issues necessitates a careful assessment of the tension between 21 U.S.C. § 848 and the constitutional protections afforded the defendants by the Fifth Amendment and, to some extent, by the Sixth Amendment. Many of those issues have not been accorded extensive judicial consideration and none of them are the subject of controlling authority in the Fourth Circuit.

## I. GUILT PHASE MENTAL HEALTH NOTICE, EXAMINATION AND DISCOVERY

The defendants recognize that Federal Rules of Criminal Procedure 12.2 and 16(b) impose discovery requirements on capital defendants with respect the presentation of mental health defenses at the *guilt phase* of the trial. *See*, Fed.R.Crim.P. 12.2, 16(b). Rules 12.2(a) and 12.2(b) require that defendants provide notice of their intention to present evidence of mental health illness or defect during the guilt phase of any criminal trial. If such a notice is given, a court may order a defendant to submit to an examination by a government expert. Fed.R.Crim.P. 12.2(c). The defendants further recognize the reciprocal discovery provisions of Rule 16(b)(1) relating to a defendant's *guilt phase* evidence and do not contest that those obligations extend to evidence respecting mental condition.

The timing of the defendants' reciprocal discovery is governed by Rule 12.2. That rule provides that, if a defendant intends at trial to rely on the defense of insanity at the time of the alleged offense or intends to introduce expert testimony relating to any other mental condition, he shall provide notice to the Government and the Court "within the time provided for the filing of pretrial motions or at such later time as the Court may direct." Fed.R.Crim.P. 12.2(a); *see also* Fed.R.Crim.P. 12.2(b) (same). In this case, the Court set November 11, 1996 as the date upon which all pretrial motions "then knowable to counsel" were to be filed.[2] *See* Order, October 8, 1996 at 3. That Order also provided, however, that "[a]ny party may thereafter file a motion with supporting brief if the ground for such motion was not reasonably knowable on November 11, 1996 and upon a showing of good cause for the proposed late filing." *Id.* The Government's Motion has created the potential for misunderstanding this previous Order with respect to the deadlines set for the filing of pretrial motions.

To date, no defendant has provided Rule 12.2 notice, and the time to do so has come and gone because the time for filing pretrial motions has expired, and the Court has not directed a later time for the filing of Rule 12.2 notice, nor has any defendant requested an extended time for filing such a notice. However, some confusion has been interjected into the proceedings because of the Government's request in its Motion that the Court "set a uniform deadline for all [defendants] for notice of any mental health defenses going to either guilt or sentence." Therefore, notwithstanding the Orders of October 8, 1996 and December 23, 1996, it is possible that defendants have been waiting for the resolution of the Government's Motion to determine whether they intend to rely on mental health defenses at the trial as well as at sentencing. Therefore, to afford the defendants a full opportunity to consider whether they will present mental health testimony at the guilt phase, the Court will allow the defendants to provide notice under Rule 12.2 not later than April 28, 1997.

## II. PENALTY PHASE MENTAL HEALTH NOTICE, EXAMINATION AND DISCOVERY

### A. THE LEGAL PRINCIPLES APPLICABLE TO NOTICE, EXAMINATION AND DISCOVERY IN THE DEATH PENALTY PHASE OF PROSECUTIONS UNDER 21 U.S.C. § 848.

The threshold questions are whether a defendant in a capital case under Section 848

---

2. This date, of course, was not applicable to Defendant Beckford, who was not arraigned until December 23, 1996. On that date, however, by Order, the Court mandated that "[a]ll motions on behalf of the defendants shall be filed not later than January 22, 1997."

can be required to give notice of his intent to introduce mental health testimony bearing on the determination of an appropriate penalty, and whether he may be subjected to a court-ordered examination and to reciprocal discovery obligations. The analysis of these issues implicates the Federal Rules of Criminal Procedure, the inherent judicial power to regulate the course of criminal cases, and the terms of 21 U.S.C. § 848(j), which confers the right of rebuttal upon the Government. And, of course, this assessment must be made against the backdrop of the constitutional strictures fixed by the Fifth and Sixth Amendments.

### 1. The Federal Rules of Criminal Procedure

 The Government concedes, as it must, that neither Fed.R.Crim.P. 12.2 nor 16(b)(1) applies explicitly to the penalty phase of the case. More importantly, the rather explicit language of both rules limits their application to the guilt phase of a trial. *See, e.g.* Fed.R.Crim.P. 12.2(b) ("If a defendant intends to introduce expert testimony relating to a mental disease or defect or any other mental condition of the defendant *bearing upon the issue of guilt ...*") (emphasis added); Fed.R.Crim.P. 12.2(a) (respecting notice of the insanity defense at trial); Fed.R.Crim.P. 16(b)(1)(A) (respecting evidence "which the defendant intends to introduce as *evidence in chief at the trial*") (emphasis added); Fed.R.Crim.P. 16(b)(1)(B) (same).[3] The plain language of the rules, therefore, cannot be read to provide authority for the

notice and reciprocal discovery which the Government asks the Court to order respecting the penalty phase of the trial.

### 2. The Inherent Judicial Power

 The Government next asserts that the function of mental health issues which may be raised during the penalty phase of a capital prosecution is directly analogous to the function served by the insanity defense presented at the guilt phase of any trial and that, therefore, the analytical framework established by the Federal Rules provides the guiding principles to be applied concerning notice and reciprocal discovery in the penalty phase.

This, of course, is an argument that the authority to impose notice and reciprocal discovery is an inherent judicial power which need not be grounded in a specific statute or rule. It also is an assertion that such power, if it exists, should be exercised in exactly the same manner as prescribed by Rules 12.2 and Rule 16(b).

The first, and determinative, question is whether there is inherent judicial power to order notice and reciprocal discovery. Confronted with situations in which the Federal Rules of Criminal Procedure were not applicable, courts historically have invoked inherent judicial powers to address the general circumstances here presented and to craft appropriate solutions to them. For example, before the enactment of Fed.R.Crim.P. 12.2 in 1974, numerous courts, including the

---

**3.** The Government makes much of the fact that the words "case in chief" do not appear in subsection (b)(1)(C) of Rule 16. That subsection requires the defendant to "disclose to the government a written summary of testimony the. defendant intends to use under Rules 702, 703 and 705 of the Federal Rules of Evidence as *evidence at trial.* This summary must describe the opinions of the witnesses, the bases and reasons therefor, and the witness' qualifications." Fed.R.Crim.P. 16(b)(1)(C) (emphasis added). From that point of departure, the Government argues that, because that subsection says nothing about "case-in-chief" or "guilt," that part of Rule 16 applies to expert testimony the defendant intends to use at sentencing as well as at trial on the guilt issue.

That interpretation of Rule 16(b)(1)(C) is unconvincing. First, under the terms of the federal death penalty statute, the Federal Rules of Evi-

dence are inapplicable to sentencing phase proceedings. *See* 21 U.S.C. 848(j) ("Any [] information relevant to such mitigating or aggravating factors may be presented by either the Government or the defendant, *regardless of its admissibility under the rules governing admission of evidence at criminal trials,* except that information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.") (emphasis added). Thus, the reference in Rule 16(b)(1)(C) to "Rules 702, 703 and 705 of the Federal Rules of Evidence" in Fed.R.Crim.P. 16(b)(1)(C) cannot reasonably be construed to apply to a capital sentencing proceeding. Second, as explained above, Rule 16(b)(1), when read as a whole, applies only to the *guilt phase* of a prosecution, the omission of the phrase "case in chief" in one subsection of that Rule notwithstanding.

Fourth Circuit, had recognized the existence of inherent judicial authority to order a defendant to give the Government notice of a psychiatric defense and to submit to examination by a Government expert. *See, e.g., United States v. Albright*, 388 F.2d 719, 722 (4th Cir.1968); *Pope v. United States*, 372 F.2d 710 (8th Cir.1967) (*en banc*), *vacated and reversed on other grounds*, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968); *Alexander v. United States*, 380 F.2d 33 (8th Cir.1967); *Winn v. United States*, 270 F.2d 326 (D.C.Cir.1959), *cert. denied*, 365 U.S. 848, 81 S.Ct. 810, 5 L.Ed.2d 812 (1961).

In *Albright*, the Fourth Circuit explained that: "the principle seems established that a district court in a criminal case has inherent power to require a psychiatric examination of a defendant, where the defendant has pleaded insanity as a defense, submitted to examiners of his own choosing and presented testimony to support his defense.... We hold, therefore, that the district court had ample authority to order a defendant to submit to a psychiatric examination." 388 F.2d at 722–23.[4] Although *Albright* pre-dated Rule 12.2, the proposition for which it stands (that courts have the inherent authority to require notice and to order psychiatric examinations) has been affirmed by the Fourth Circuit since the promulgation of Rule 12.2. *See, e.g. Gibson v. Zahradnick*, 581 F.2d 75, 78 (4th Cir.1978) ("we held [in *Albright*] that a federal court had inherent authority to order a psychiatric examination and evaluation to assist in a determination of the defendant's mental and emotional condition"), *cert. denied*, 439 U.S. 996, 99 S.Ct. 597, 58 L.Ed.2d 669 (1978); *United States v. Lewis*, 53 F.3d 29, 35–36 n. 9 (4th Cir.1995) (district court

did not err in ordering psychiatric examination in light of defendant's stated intent to rely upon claim of sub-normal intelligence in support of entrapment defense despite the technical inapplicability of Rule 12.2(b)). The Government urges the exercise of those inherent powers to craft *penalty phase* reciprocal discovery requirements similar to those specified in Rules 12.2 and 16(b)(1) for the guilt phase of the trial.

The defendants assert that those inherent powers were abrogated by promulgation of the Federal Rules of Criminal Procedure. Specifically, the defendants contend that, because the rules provide for notice, examination and discovery respecting the guilt phase but do not provide for notice, examination or discovery in the penalty phase, whatever inherent judicial powers existed before the promulgation of Rules 12.2 and 16 did not survive. That argument does not square with substantial decisional authority to the contrary.

Indeed, numerous courts, including the Fourth Circuit, have recognized that the discovery provisions in Rules 12.2 and 16(b) are not exclusive and do not supplant a district court's inherent authority to order discovery outside the rules. *See, e.g. United States v. Fletcher*, 74 F.3d 49, 54 (4th Cir.1996) (district court had authority to require defendant to produce witness list prior to trial); *United States v. Kloepper*, 725 F.Supp. 638, 640 (D.Mass.1989) (district court has inherent authority to order handwriting exemplars and fingerprints of defendant to be produced even though not specifically listed in Rule 16); *United States v. Hearst*, 412 F.Supp. 863, 870 (N.D.Cal.1975) (defendant ordered to give government notice and discovery of

---

4. In *Pope v. United States,* a case which, like *Albright,* pre-dated the adoption of Rule 12.2, the Eighth Circuit, sitting *en banc,* also held that a district court possessed inherent authority to compel the defendant to submit to mental examination. Then–Judge Blackmun wrote for the unanimous Eighth Circuit:

> It would be a strange situation, indeed, if, first, the government is to be compelled to afford the defense ample psychiatric service and evidence at government expense and, second, if the government is to have the burden of proof, and yet it is to be denied the opportunity to have its own corresponding and verifying examination, a step which perhaps is the most

trustworthy means of attempting to meet that burden.

> We therefore specifically hold that by raising the issue of insanity, by submitting to psychiatric and psychologic examination by his own examiners, and by presenting evidence as to mental incompetency from the lips of the defendant and those examiners, the defense raised that issue for all purposes and that the government was appropriately granted leave to have the defendant examined by experts of its choice and to present their opinions in evidence.

388 F.2d at 720.

novel defense of "brainwashing" by a cult group despite the fact that it did not fall within the strict dictates of Rule 12.2); *United States v. North*, 708 F.Supp. 399, 401 (D.D.C.1988) (defendant ordered to produce to government pretrial classified documents upon which he intended to rely at trial); *United States v. Bender*, 331 F.Supp. 1074, 1075 (C.D.Cal.1971) ("It has long been held that the Federal Courts possess inherent authority to order discovery and inspection."); *but see United States v. Akers*, 945 F.Supp. 1442, 1446–49 (D.Colo.1996) (interpreting Rule 12.2(a) as mandating government examination of defendant only where defendant provides notice of reliance on the *insanity defense* as opposed to other evidence of mental condition) (citing *United States v. Davis*, 93 F.3d 1286 (6th Cir.1996) (same)).

The decision in *United States v. Kloepper*, 725 F.Supp. 638 (D.Mass.1989), is particularly instructive. In *Kloepper*, the defendant objected to a magistrate judge's order requiring the defendant to provide a handwriting exemplar and to submit to the taking of fingerprints and palmprints before trial. The defendant argued that courts were without the power to make such an order absent authority by statute or rule of court. The district court recognized that the order was "for production of a type of evidence not specifically described in the discovery provisions of Fed.R.Crim.P. 16." *Id.* at 640. Nonetheless, the district court affirmed the order based on the inherent power of the courts to require discovery in criminal cases, finding that:

> [P]rior to the first promulgation of the Criminal Rules in 1946, Federal criminal

procedure in the District Courts grew out of *the inherent powers of the Courts to develop their own procedure. The Federal Rules of Criminal Procedure were not designed to and do not entirely supplant this fundamental authority and residual power of the Court.* It has long been held that the Federal Courts possess the inherent power to order discovery and inspection. *Id.* (quoting *United States v. Bender*, 331 F.Supp. 1074, 1075 (C.D.Cal.1971)) (emphasis added); *see also Id.* ("to the extent that Rule 16 does not express a policy prohibiting discovery not explicitly authorized by the Rules, the court is free, either by local rule or by adjudication, to permit discovery on the basis of its inherent power.") (quoting *United States v. Taylor*, 25 F.R.D. 225, 228 (E.D.N.Y.1960)); *Peek v. United States*, 321 F.2d 934, 942 (9th Cir.1963) ("[Q]uite apart from Rules 16 and 17(c) the court possesses inherent authority to grant requests for production of material.").[5]

More importantly, the argument that judicial authority to address a circumstance presented in criminal cases exists only where a specific rule governs that circumstance runs counter to the fact that the Federal Rules of Criminal Procedure themselves explicitly recognize that the rules cannot cover every situation which may arise during the course of criminal cases. That is why Rule 57(b) provides that where no law or rule is directly applicable, "[a] judge may regulate practice in any manner consistent with federal law, these rules, and local rules of the district." Fed.R.Crim.P. 57(b). Hence, it seems rather clear that the inherent powers of the courts to fashion rules of discovery has been incorporated in the Rules by Fed.R.Crim.P. 57(b).

---

5. Defendant Beckford cites *United States v. Layton*, 90 F.R.D. 520 (N.D.Cal.1981), for the proposition that pre-existing procedures simply do not survive contrary legislative codification. *Id.* at 522–23 (rejecting Government's theory of "inherent powers" to order discovery in the wake of new discovery rules).

Beckford's argument, however, is contrary to the overwhelming weight of authority cited above. Moreover, *Layton* is readily distinguishable from this case. In *Layton*, the Government sought discovery of taped conversations between the defendant and his privately retained psychiatrist. It was undisputed that neither side intended to call that psychiatrist at trial or attempt to

introduce the tapes into evidence. The court held that this "non-evidentiary use of the tapes" was too slight a Government interest to require their production. *Id.* at 523. The *Layton* Court specifically noted that the purpose behind discovery of psychiatric information—preparation for cross-examination—was therefore not implicated by the Government's request. In this case, however, the Government seeks notice of the names of expert witnesses *who will testify for the defense*, their qualifications, and their written reports, as well as the opportunity to conduct its own examination. Clearly, this requested use is "evidentiary" as *Layton* used that term.

*See United States v. Kloepper,* 725 F.Supp. at 640; *United States v. Bender,* 331 F.Supp. at 1075. That view of Rule 57(b) is confirmed by the Advisory Committee Notes to the 1974 revision of Rule 16 which specifically explain: "The rule is intended to prescribe the minimum amount of discovery to which the parties are entitled. It is not intended to limit the judge's discretion to order broader discovery in appropriate cases." Advisory Committee Note to Rule 16, *reprinted in* 62 F.R.D. 271, 308 (1974).[6]

For the foregoing reasons, the inherent powers of district courts provide sufficient authority for the imposition of notice, examination and discovery of mental health conditions in the death penalty phase of a prosecution brought under Section 848. Of course, those powers must be exercised in a manner consistent with federal constitutional and statutory laws and their applicable rules of procedure.

### 3. The Terms of the Statute

■ The statute under which this prosecution is pursued underscores that the district courts possess the inherent authority to order penalty phase discovery. For the following reasons, the Court finds, in 21 U.S.C. § 848(j), a statutory basis to assert its inherent authority to require notice of mitigating factors keyed to a capital defendant's mental health and to require examination of that defendant respecting mental health issues which he plans to present during the penalty phase.

■ First, the analysis must begin with the fundamental premise that the scope of mitigation testimony that a defendant may present in a death penalty case is broad, and in accordance with the Eighth Amendment, can be curtailed only under limited circumstances. *Lockett v. Ohio,* 438 U.S. 586, 604–05, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978). Accordingly, the statute, 21 U.S.C. § 848(m), permits a defendant to introduce evidence of any mitigating factor, including significant impairment of the defendant's capacity to appreciate the wrongfulness of his conduct.[7]

Second, the statutory scheme in Section 848(e) (entitled "Death Penalty") establishes, for the conduct of the penalty phase of a capital trial, certain procedures which are unique to sentencing in capital cases. Those rules are dictated largely by the Supreme Court's interpretation of the Eighth Amendment, to which the statute is an obvious response.

However, the statute clearly does not purport to provide a complete guide to pre-trial issues in a capital case. The absence of such a comprehensive scheme points strongly to the conclusion that Congress left the control of the pre-trial aspects of capital cases (*e.g.* discovery matters) with the courts unless it specifically provided otherwise.[8]

Third, another subsection of the statute, 21 U.S.C. § 848(j), clearly provides that the "government *shall be permitted to rebut any information received at the hearing* and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any of the mitigating factors." (emphasis added) The right of rebuttal must be considered in perspective of the provisions in Section 848(m)(1), (2) and (10), which permit mitigation based solely on mental health or mental condition. Mitigating evidence of that sort reasonably could be expected to be presented by an expert in psychology or psychiatry.

When these sections of the statute are construed together, it is rather clear that, at the very minimum, the Government must have access to the reports prepared by the defendants' mental health experts in order to rebut, in any reasonable sense of that term, the accuracy of the conclusions reached by

---

**6.** The penalty phase of a capital case, with the premium placed upon accuracy and fairness, would seem to be an "appropriate case" to require reciprocal discovery beyond the norm.

**7.** Of course, the evidence must be related in some reasonable way to the facts of the case and it must have a basis in the evidence and the law.

**8.** Indeed, a serious constitutional issue may arise under Article III if the statute or the Federal Rules of Criminal Procedure are construed to abrogate the inherent judicial powers of the federal courts to the extent argued by the defendants. There is no need to consider that question here.

the experts. Indeed, the defendants do not seriously suggest otherwise. Moreover, as conceded by the defendants at oral argument, the Government also must be provided with some advance notice of a defendant's intent to rely on expert testimony at the penalty phase so that the Government may procure the attendance of its own expert to observe and evaluate the testimony of the defense experts.

It is at that point, however, where the defendants draw the line by arguing that the Government adequately can rebut any defense experts' testimony if the Government and its experts have access to the defense experts' report. That, say the defendants, would afford the Government's experts an adequate basis on which to offer a critique of the defense experts' methods and conclusions without resort to an independent examination.

The defendants' position misses the mark by a wide margin because it ignores the reality that the key to any effective rebuttal of a mental health defense depends on examination of the defendant, just as the key to presentation of an effective mental health mitigation case requires that the defendant's expert has examined the defendant. As the district court explained in *United States v. Haworth*:

> Psychiatry is far from an exact science because it does not rely primarily on the analysis of raw data. Instead, the basic tool of psychiatric study remains the personal interview, which requires rapport between the interviewer and the subject. *The Government's expert cannot meaningfully address the defense expert's conclusions unless the Government's expert is given similar access to the 'basic tool' of his or her area of expertise: an independent review with and examination of the defendant.*

942 F.Supp. 1406, 1407–08 (D.N.M.1996) (emphasis added) (internal citations and quotations omitted). The Fourth Circuit also has emphasized the value and importance of medical examination by experts:

> Not only to enable the government to carry its full load, but also to respect the inviolability of the human personality, the [mental] examination [of the defendant by government experts] here was indicated.... [T]he government, to meet its burden of proof, would have access to only three kinds of proof: cross-examination of defendant's experts, lay testimony, and testimony of government experts predicated upon courtroom observations and hypothetical questions. *Medical science ... deems these poor and unsatisfactory substitutes for testimony based upon prolonged and intimate interviews between the psychiatrist: and the defendant.* Half truths derived from these unsatisfactory substitutes do more to violate human personality than full disclosure, especially because there is always. the possibility that the psychiatrist who examines for the government and thus has full knowledge of a defendant, may corroborate his contention that he is legally insane.

*United States v. Albright*, 388 F.2d at 724–25 (emphasis added) (internal citations and quotations omitted) In perspective of these undeniable truths, it is clear that the Government's ability to rebut a defendant's evidence of mental condition would be sharply curtailed, if not entirely eviscerated, if notice of a mental health defense is not required and if, thereafter, the Government is not afforded the opportunity to have the defendant examined by an independent mental health expert.

In recognition of this fundamental principle, the only decisions which have addressed this precise issue in the context of a federal capital case have adopted some of the notice and discovery procedures the Government requests here. In *United States v. Vest*, 905 F.Supp. 651 (W.D.Mo.1995), three defendants were charged with capital offenses under 21 U.S.C. § 848(e). The Government made a motion for entry of an order: (1) requiring notice of intent to rely on mental health defenses at the penalty phase by a date certain; (2) permitting access to the defendants for examination by government experts; and (3) requiring production of reports prepared by defense experts. The district court imposed a notice deadline and required an examination by Government experts.

The rationale for the decision in *Vest* was grounded on the conclusion that the Government's statutory right to rebut any mitigating evidence animated the necessity to require pre-trial notice of a mental capacity or mental health defense in the penalty phase as well as a mental examination because "the provision authorizing rebuttal is rendered meaningless," without notice of mental health defenses, access to defense expert reports, and examination of the defendant by government experts. *Id.* at 653. That condition is fully supported by the statute and by logic.[9]

In *United States v. Haworth,* two defendants were death-eligible under Section 848(e). As to those defendants, the Government moved the Court to require the defendants to notice their intent to rely on mental health defenses at the penalty phase and, if such notice was given, to require the defendants to be examined by government experts. Although the district court noted, quite correctly, that "there is no statute or rule expressly permitting a court to order an independent psychological examination for the government's use," the court granted the Government's motion based on the right of rebuttal conferred by Section 848(j) which would be impermissibly "curtailed" without such notice and access to the defendant. *Id.* at 1408.

In response to that precedent, the defendants reassert their argument that, in 21 U.S.C. § 848, Congress provided "a comprehensive scheme for the trial and pretrial procedures applicable to capital cases."[10] The defendants correctly note that, while Section 848(h) expressly requires the Government to provide, "a reasonable time before trial or acceptance by the court of a plea of guilty," notice of its intention to seek the death penalty and of the aggravating factors which the Government will seek to prove as the basis for the death penalty, and while the statute specifically granted the Government the right to rebut the defendant's mitigating evidence, *see* 21 U.S.C. § 848(j), Congress did not statutorily require capital defendants to provide the notice sought by the Government. The defendants also cite *Lorillard v. Pons,* 434 U.S. 575, 582, 98 S.Ct. 866, 871, 55 L.Ed.2d 40 (1978), and *Pittston Coal Group v. Sebben,* 488 U.S. 105, 119, 109 S.Ct. 414, 422–23, 102 L.Ed.2d 408 (1988), for the proposition that where the legislature establishes a comprehensive scheme, the courts should assume that any omissions were intentional.

In this context, the defendants' argument has some appeal, but it ultimately is unpersuasive. First, the terms of the statute here show clearly that it is not intended as a complete guide to pre-trial and trial procedure in capital cases. Therefore, the courts must, when appropriate, supplement the rather limited procedures set forth by Congress in the statute. Second, decisions such as *Lorillard* and *Pittston* are inapposite because both involved Congressional decisions to retain or to omit aspects of *previously-existing* complex regulatory schemes. *See Lorillard,* 434 U.S. at 580–81, 98 S.Ct. at 869–70 (Congress enacted new statutory scheme, the Age Discrimination in Employment Act, and specifically stated that the Act was to be enforced in accordance with the "powers, remedies, and procedures" of another statute); *Pittston,* 488 U.S. at 108–09, 113, 109 S.Ct. at 417–18, 419–20 (statutory administrative scheme for providing benefits to coal miners in which Congress mandated that certain regulations for ascertaining benefits not be more restrictive than those in place at a particular time). In this case, however, Congress did not incorporate, or make reference to, another death penalty statute in 21 U.S.C. § 848(e). If Congress had enacted a death penalty statute before it passed Section 848(e) which contained a notice provision

9. The court, in *Vest,* also observed that: "[a]lthough Fed.R.Crim.P. 12.2(b), by its strict terms, applies only to the guilt phase of the trial, employing a similar process for the penalty phase would serve the dual purposes of promoting efficient and fair resolution of the issues at hand while preserving the defendants' Constitutional rights." *Id.* at 652. That statement is really beyond serious question, but it is not a grant of authority. Rather, it provides a common sense rationale to use Rule 12.2 as a guide for the exercise of such authority as is found to exist.

10. As discussed above, the defendants initially asserted that argument with ·respect to the alleged displacement of the court's inherent authority to order notice and discovery by the promulgation of the Federal Rules of Criminal Procedure.

for penalty phase defenses and then had chosen to omit that provision from Section 848, *Lorillard* and *Pittston* would be instructive. That, however, simply was not what happened here.

As explained in *Vest:* "[I]f a defendant elects to present mitigation testimony addressing his mental status, then the government is free to rebut such testimony." 905 F.Supp. at 653. And, as aptly put in *Haworth*, "[i]f a defendant elects to present evidence of his mental condition as a reason why he should not be sentenced to death, the Government must be able to follow where he has led and introduce its own countervailing evidence." 942 F.Supp. at 1408 (internal quotations and citations omitted) For, unless the Government is allowed to conduct its own mental health examination, it may be deprived "of the only effective means it has of controverting ... proof on an issue that [the defendant has chosen to] interject [ ] into the case." *Estelle*, 451 U.S. at 465, 101 S.Ct. at 1874.

Like the courts in *Vest* and *Haworth*, the Court here finds that the Government's statutory right of rebuttal provides implicit authority to require notice, examination and discovery on mental health issues and conditions in order to make that rebuttal right a meaningful one. Any other interpretation would effectively frustrate the statutory right afforded the Government by Congress. And, of course, that right is significant because the Government must prove death-eligibility to the satisfaction of all jurors beyond a reasonable doubt whereas the defendant need only convince one juror by a preponderance of the evidence that death is not an appropriate punishment. *See supra* note 1.

### 4. The Constitutional Considerations

The foregoing does not dispose of the issue because there are constitutional considerations which must be juxtaposed to the provisions of the Rules, the inherent judicial powers and the statutory terms which form the basis for the Government's positions. Indeed, the courts in *Vest* and *Haworth* recognized that "[r]equiring a defendant to undergo a psychiatric examination may, in some circumstances, infringe on a defendant's rights under the Fifth and Sixth Amend-

ments." *Vest*, 905 F.Supp. at 653 (citing *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981)); *see also Haworth*, 942 F.Supp. at 1408–09. And, not surprisingly, Defendants Beckford, Dennis, Cazaco, and Thomas assert that a Government examination in this case would, in fact, violate their constitutional rights. They ground that argument in the teachings of *Estelle v. Smith*.

In *Estelle*, the Supreme Court held that a capital defendant's Fifth Amendment privilege is violated where a state requires him to undergo psychiatric evaluation and then uses his statements, demeanor, and the expert conclusions drawn therefrom at the penalty phase of the trial to demonstrate future dangerousness. In particular, the Court held that the prosecution cannot introduce psychiatric testimony at the penalty phase if the defendant was subjected to the mental health examination without waiving his Sixth Amendment right to counsel, and without being informed of his *Miranda* rights as required by the Fifth Amendment. 451 U.S. at 462, 101 S.Ct. at 1872–73.

The facts in *Estelle* are significant to the resolution of the defendants' arguments here because the defendant in *Estelle* did not introduce any psychiatric evidence at trial. Nor, had he expressed any intention to do so. Nonetheless, the trial court required him to undergo a mental health examination, and the state thereafter presented information garnered during that examination to persuade the jury to impose a death sentence, even though the defendant never offered any mental health evidence. *Id.* at 466, 101 S.Ct. at 1874–75. The Supreme Court found a violation of the Fifth Amendment and affirmed the issuance of a writ of habeas corpus for the reason that: "A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing hearing." *Id.* at 468, 101 S.Ct. at 1876.

In *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), the Supreme Court considered application of the

rule in *Estelle* to a case in which the capital defendant, unlike *Estelle*, had placed his mental state at issue in defense of capital charges. There, the Court determined that, when a defendant "requests [a mental health] evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution." *Id.* at 422, 107 S.Ct. at 2917 (citations omitted). The Fourth Circuit recently has explained the import of the Supreme Court's holding in *Buchanan:*

> When a defendant asserts a mental status defense and introduces psychiatric testimony in support of that defense, he may face rebuttal evidence from the prosecution taken from his own examination or he may be required to submit to an evaluation conducted by the prosecution's own expert. That defendant has no Fifth Amendment protection against the introduction of mental health evidence in rebuttal to the defense's psychiatric evidence. *In essence, the defendant waives his right to remain silent . . . by indicating that he intends to introduce psychiatric testimony.*

*Savino v. Murray,* 82 F.3d 593, 604 (4th Cir.1996) (*citing Buchanan,* 483 U.S. at 422–23, 107 S.Ct. at 2917–18; *Powell v. Texas,* 492 U.S. 680, 684–85, 109 S.Ct. 3146, 3149–50, 106 L.Ed.2d 551 (1989)) (emphasis added) (internal quotations omitted). The application of the principles established in *Estelle, Buchanan* and *Savino* to this case is set forth below.

## B. THE COMPETING FACTORS AND THE BALANCE OF INTERESTS.

■ The foregoing illustrates the need to strike a balance between securing a defendant's Fifth Amendment rights and affording the Government a meaningful right of rebuttal on mental health issues. As set forth below, that balance is best struck by: (1) requiring reasonably early notice by the defendants that they intend to rely on mental health or mental conditions in mitigation of death in the penalty phase; (2) requiring an examination within a reasonable time there-

after; and (3) deferring the release to the Government of the Government's expert reports and the defense expert reports until after a finding of guilt necessitates a decision by the defendants on how to proceed with the penalty phase. In this way, the defendant's rights are preserved, and the Government's rebuttal right is secured.

■ *Estelle, Buchanan* and *Savino* teach that the protection afforded by the Fifth Amendment ceases when a defendant indicates that he intends to introduce mental health evidence in the penalty phase of a capital case. And, where a defendant makes that decision upon advice of counsel, there is certainly no infringement of the Sixth Amendment.

■ Of course, under the Fifth Amendment, as applied in *Estelle,* "a defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence may not be compelled to respond to a psychiatrist *if his statements can be used against him at a capital sentencing hearing.*" *Estelle v. Smith,* 451 U.S. at 468, 101 S.Ct. at 1876 (emphasis added). Therefore, a court cannot simply require a defendant to undergo psychiatric examination if his statements can be used against him in the penalty phase at the Government's own initiative. *Estelle,* however, does not prohibit the issuance of an order requiring a defendant to respond to the Government's psychiatrist or psychologist *if the defendant's statements cannot be used against him at sentencing unless and until the defendant actually introduces mental health evidence in mitigation of the death penalty at that phase of the proceedings.*

■ *Estelle, Buchanan* and *Savino* are significant also because they do not instruct that either the Fifth Amendment or the Sixth Amendment is infringed by a requirement that a defendant declare his intent to present mental health evidence at a time certain in advance of trial. Nor has it ever been held that Fed.R.Crim.P. 12.2 is constitutionally infirm by requiring a pretrial deadline for notice of use of the insanity defense during the guilt phase. And, as explained above, the district courts have the inherent power

and the implicit statutorily-derived power to impose a pre-trial notice requirement.

In this regard, *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), is instructive. In *Williams,* the Supreme Court rejected the argument that requiring a criminal defendant to give pretrial notice of alibi—including the location claimed and the identification of supporting witnesses—violated the Fifth Amendment.

The Supreme Court in *Williams* stated that:

> *Nothing in the Fifth Amendment privilege entitles a defendant as a matter of constitutional right to await the end of the State's case before announcing the nature of his defense,* any more than it entitles him to await the jury's verdict on the State's case-in-chief before deciding whether or not to take the stand himself.

*Williams,* 399 U.S. at 85, 90 S.Ct. at 1898 (emphasis added). Therefore, the mere imposition of a pre-trial deadline for capital defendants to state their intention to offer evidence pertaining to mental health or mental condition does not violate the Fifth Amendment rights sought to be protected by the rule of *Estelle.*

■ Even where the defendant is required to give pre-trial notice of his intent to use mental health evidence at the sentencing phase, however, the statements made in any Court-ordered examination cannot constitutionally be used against the defendant *in the*

*guilt phase.* Therefore, it is essential that the results of any Court-ordered examination which ensues such notice must not be available to the Government until after conclusion of the guilt phase.[11] In like fashion, disclosure of the defense expert reports also must be deferred until after guilt is determined. That, indeed, is the only way (other than adopting a rule that no examination can be required) to assure to a defendant the benefit of the Fifth Amendment as interpreted by *Estelle, Buchanan* and *Savino.*

That is not, however, the end of the matter because, even if the jury returns a verdict of guilty on a capital charge, a defendant might elect not to use evidence of mental health or condition for any number of reasons not readily ascertainable until all evidence in the guilt phase is presented and the verdict on all charges is known.[12] Hence, depending on the case, the actual line of constitutional demarcation for waiver of the Fifth Amendment may not be reached until after conclusion of the guilt phase.

■ To defer the notice requirement until then, however, presents serious difficulties for the defendant, the Government and the judicial system. If, at that point, the defendant for the first time discloses his intent to offer mental health evidence in mitigation, there would be a lengthy delay before the commencement of the sentencing phase while the Government experts examine the defendants.[13]

11. Making the report of the examination available to the prosecution before conclusion of the guilt phase would present the risk of inadvertent use and would lead to difficult problems respecting the source of prosecution evidence and questioning in the guilt phase.

12. Also, in order to properly assess the evidence of the aggravating factors for risk of prejudice, *see* 21 U.S.C. § 848(j), the Court has required the Government to make a proffer of the evidence it intends to offer on those factors. The proffer will be made before conclusion of the guilt phase and knowledge of that proffer will be an important factor in the defendants' decision whether to offer mental health evidences in mitigation.

13. The defendants argue that any Court-ordered examination should be held, if at all, only after the return of a guilty verdict. That suggestion, however, is not supported by the evidence offered at the hearing on this issue. The validity of

a post-guilt phase examination of a capital defendant may be seriously questioned. At the hearing on this matter, the Government's expert, Dr. Thomas V. Ryan, opined that the results of a pre-trial examination would be significantly more reliable than those of an examination conducted after the return of a guilty verdict but before the completion of the penalty phase. Dr. Ryan testified that the results of a post-guilt examination would be significantly skewed by potential depression, tension, and anxiety on the part of a defendant who has been adjudged guilty and is thus only one step away from receiving the death penalty. Moreover, a defendant may arguably perceive a stronger motivation to malinger where the reality of facing the death penalty becomes more immediate.

Dean Beckford's expert witness, Dr. Robert P. Hart, opined that a post-trial examination would be less problematic than anticipated by Dr. Ryan because clinical psychiatric tests often include

To a jury which likely will have been sitting for several weeks on the guilt phase, the prospect of a lengthy delay before sentencing commences is fraught with difficulty. Most troublesome is the fact that evidence for the guilt phase, which usually is adopted at sentencing, will fade from the minds of the jurors; thus, content and context will be harder for the jurors to remember, and the relative roles played by the defendants will be harder for jurors to recall. This is prejudicial to the Government and the defendants equally.

Further, evidence offered only in the penalty phase will be more protracted because of the need to link it logically to the guilt phase issues. The greater the delay between phases, the greater is the need to re-establish, by testimony previously offered, the essential nexus between purely penalty phase evidence and the offenses to which it relates.

Moreover, because the same jury which determines guilt will determine the penalty, see 21 U.S.C. § 848(i)(1)(A),[14] delay between guilt and penalty phases increases the risk that a juror will fall ill or pass away or otherwise will become unavailable. Of course, that risk is present even if there is only a brief delay between the guilt and penalty phases. But, that risk is materially increased by an extensive delay between the proceedings while the Government experts conduct mental examinations of the defendants. And, although the use of alternate jurors is possible, it is quite undesirable at that point in the case.

A related consequence of the delay inherent in deferring the Government's examination until after the guilt phase is the increased difficulty in securing jurors in the first instance. The longer the expected duration of a case, the greater the risk that qualified jurors will be unable to serve. This, of course, works to the prejudice of the defendants, the Government and the judicial system.

For the foregoing reasons, it is essential to strike the appropriate balance between the constitutional rights of the defendants, the Government's rebuttal right, and the interests of the Court and the litigants in fairness and judicial efficiency. The requirements of pre-trial notice and pre-trial examination secure the Government's rebuttal right and ensure that extensive post-guilt phase delay does not compromise considerations of fundamental fairness to the litigants and of judicial efficiency. And, strict prohibition on the release to the Government of reports prepared by its experts and by the defense experts until after a finding of guilt preserves the defendants' constitutional rights.

### C. THE PROCEDURES TO BE FOLLOWED.

As explained above, if a defendant elects, with the advice of counsel, to put his mental status into issue in the penalty phase, then he has waived his right to refrain from self-incrimination arising from a mental health examination, and there is no Fifth or Sixth Amendment concern. Nevertheless, courts must remain mindful that the notice and subsequent independent examination sought by the Government have the potential for treading on the defendants' Fifth and Sixth Amendment rights. Those rights can be appropriately secured, however, by the imposition of sufficient protections in the form of strict limitations on the examination and discovery procedures employed and the disclosure of any statements made by the defendant during the examination. The contours of the limitations which will be imposed in this case are set forth below.

First, any defendant who wishes to introduce mental health testimony at the penalty phase must file written notice thereof not later than April 28, 1997. The notice shall include the name and professional qualifications of any mental health professional

measurements to take account of the subject's feelings of depression and anxiety. Dr. Hart agreed, however, that a post-trial test would not be more valid than one conducted pre-trial.

14. 21 U.S.C. § 848(i)(1) provides that where a defendant's guilt is adjudged by a jury, any sub-

sequent capital sentencing "hearing shall be conducted ... before the jury which determined the defendant's guilt" unless that jury has been discharged "for good cause." 21 U.S.C. § 848(i)(1)(A), (i)(1)(B)(iii).

who will testify and a brief, general summary of the topics to be addressed that is sufficient to permit the Government to determine the area in which its expert must be versed.[15]

■ If a defendant files a notice that he plans to introduce mental health testimony at the penalty phase, that defendant shall be examined by a psychiatrist or other mental health professional selected by the Government. The Government examination shall take place not later than May 13, 1997. The report of that examination and the expert report of any examination initiated by the defendant[16] shall be filed under seal with the Court before the commencement of jury selection.

The Court-appointed mental health professional conducting the examination for the Government shall not discuss his examination with anyone unless and until the results of the examination are released to counsel for the Government and counsel for the defendant following the guilt phase of the trial.

■ The results of any examination by the Government experts and the defense experts shall be released to the Government only in the event that the jury reaches a verdict of guilty on a capital charge as to that defendant,[17] and only after that defendant

confirms his intent to offer mental health or mental condition evidence in mitigation.

To that end, not later than two days after the return of such a verdict, each defendant who previously had provided notice, pursuant to this Order, shall file a pleading confirming or disavowing his intent to introduce mental health testimony at the penalty phase. If, in that manner, any defendant withdraws his previously-tendered notice, the results of any mental health examinations concerning that defendant will not be released to the Government. The reports of any examinations (whether by the Government or defense expert) concerning a defendant who confirms his intent to introduce mental health testimony shall be released to the Government immediately after the filing of the pleading confirming the earlier notice. At the same time, the report of the Government's expert shall be released to counsel for the defendant.

Even if a defendant confirms his intent to offer mental health evidence, the defendant may withdraw a notice of intent to raise a mental health or mental health defense at any time before actually introducing evidence on it, and, in that event, neither the fact of notice, nor the results or reports of any mental examination, nor any facts disclosed

---

**15.** The Government requests that the notice shall include "the nature of the proffered mental condition or defect and the date of its onset." That request is DENIED. Neither *Vest* nor *Haworth* required such notice by the defense. If the Government has the ability to have the defendant examined by its own expert, that expert can reach his own conclusions concerning the defendant's mental status. Moreover, while the Government is entitled to obtain a pre-trial examination, under this Order it is prohibited from learning of the results of that examination until after the jury returns a verdict of guilty with respect to the capital charges. Pre-trial notice of the precise mental condition and date of onset would contravene the effect of this strict limitation on the disclosure of the results of the Court-ordered examination.

Nor must notice include "a summary of the basis for [the] opinions" of the defense mental health expert. This information, however, shall be part of the defense expert's report which will be filed under seal with the Court and be released only after the conclusion of the guilt phase, if the verdict requires a death penalty phase.

**16.** The Government's Motion is DENIED with respect to its request that the defense be ordered "to provide the government with any and all materials supplied to the defense expert that form the basis of his or her opinion." An order of that scope would violate the defendants' Sixth Amendment right to effective assistance of counsel in that defense planning and strategy would necessarily be revealed through the production of "any and all materials supplied to the defense expert."

**17.** It is important to note that under these directives, the Government will not learn anything from the Court-appointed examination until after guilt has been determined. Although it is well-settled that restrictions such as those of Fed. R.Crim.P. 12.2(c) (*e.g.*, no use or derivative use of compelled examination except to rebut mental health defenses) satisfy the Fifth Amendment, in this case, where the Court-ordered examination will take place *well before the start of the trial*, the Fifth Amendment requires that the report of the Government's expert remain sealed until after the guilt phase.

only therein will be admissible against the defendant.

## FAILURE OF ANY DEFENDANT TO PROVIDE NOTICE OR TO PARTICIPATE IN A COURT–ORDERED EXAMINATION OR TO CONFIRM HIS FIRST NOTICE SHALL RESULT IN FORFEITURE OF THE RIGHT TO PRESENT MENTAL HEALTH TESTIMONY AT TRIAL.

■ These procedures will ensure that Government examinations of the defendants will be ordered only if a defendant provides notice of intent to use mental health or condition in mitigation. They also ensure that the results of examination will be disclosed, if, *and only if,* a defendant chooses to introduce testimony or other evidence relating to issues of his mental health at the capital sentencing hearing, thus preventing the Fifth and Sixth Amendment infringements prohibited by *Estelle.* Further, the jury will not be exposed to any mental health evidence unless the defendant first opens that door during the penalty phase.[18]

Based on the foregoing analysis, the Government's motion for a Court order requiring: (1) death-eligible defendants to provide notice of intent to raise a mental health defense at the penalty phase; (2) those defendants to submit to examination by an expert of the Government's choosing; and (3) the disclosure of expert reports is GRANTED IN PART. The remainder of the Government's motion is DENIED.

## D. MEMORIALIZATION OF DEFENDANTS' MENTAL HEALTH EXAMINATIONS.

The Government also asks the Court to require that any examination of a capital defendant undertaken by a defense expert be either attended by a Government expert or properly recorded by videotape, audiotape, and/or stenography. The Government asserts that such memorialization is the "only way the Court can ensure that the government has a meaningful opportunity to rebut mitigation evidence as set forth in 21 U.S.C. § 848(j)." The Government would agree to reciprocal attendance or recording of any Court-ordered mental examination by its experts.

The Government cites no legal authority for its request that defense experts should conduct their examinations in this particular manner. And, it should be noted that neither the *Vest* Court nor the *Haworth* Court considered a similar request for recordation by the Government.

In support of its motion, however, the Government has submitted three affidavits from Dr. Ryan which describe in detail the dangers of multiple testing in the area of cognitive ability. According to Dr. Ryan, certain well-established memory and intelligence tests can only be performed once in any six month to one year period with any degree of accuracy. Additionally, the Government proffers that it has "consulted with several mental health professionals [who] uniformly indicated to the government that certain in-

---

18. Defendant Beckford argues that it is the Government, not the defendants, who have put the defendants' mental status at issue by filing its Notice of Intent to Seek A Sentence Of Death pursuant to 21 U.S.C. § 848(h)(1), in that the Notice states the Government's intention of proving the non-statutory "future dangerousness" aggravator. Beckford asserts that the "future dangerousness" aggravator implicates mental health issues for two reasons: (1) the Government will attempt to prove that Beckford displayed a lack of remorse over the murders he is alleged to have committed; and (2) the Government will attempt to prove that Beckford has a low potential for rehabilitation.

Beckford's argument lacks merit. First, the Government has proffered that its evidence of "lack of remorse" and "low potential for rehabilitation" will consist solely of factual allegations;

the Government will tender no expert evidence to establish the existence of this aggravator. Thus, the Government is not raising the issue of the defendants' mental health status at all. Moreover, the allegations of the Notice Of Intent put the defendants' mental condition at issue only to the same extent that any charging instrument does—it implicitly alleges that the defendant is sane in the sense that he knows right from wrong and understands the consequences of his actions. If the defense wishes to show at the penalty phase, however, that a defendant suffers from a psychological condition that prevents him from possessing the requisite level of mental health, that is a mitigating factor under 21 U.S.C. § 848(m) which a defendant has the burden to raise and prove by a preponderance of the evidence.

telligence tests can be administered to a person only once in any one-year period due to the 'practice' effect of the test." Thus, the Government apprehends that, after the defense examinations, which will precede the Government's examinations, no valid retest will be possible within a useful time frame.

The Government analogizes this situation, as a legal matter, to that where one party has access to evidence which will be destroyed or altered by some scientific test or procedure. Under such circumstances, it may be appropriate for the adverse party's experts to observe the testing or, at least, have the testing recorded for later examination by its experts. *See, e.g. United States v. Beltempo,* 675 F.2d 472, 479 (2nd Cir.1982), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982); *United States v. Love,* 482 F.2d 213, 220 (5th Cir.1973), *cert. denied,* 414 U.S. 1026, 94 S.Ct. 453, 38 L.Ed.2d 318 (1973).

In Dr. Ryan's opinion, simultaneous evaluation by one or more neutral experts chosen by the Court and/or agreeable to the parties is the best method to ascertain a subject's true mental condition. Absent any such agreement,[19] the next best method would be for each side to attend and observe the other side's evaluation and to have that evaluation memorialized by video and/or audio recording for later review. In that case, the Government suggests that its expert be allowed to observe any defense testing by two-way mirror and that the testing be videotaped.

The defendants object to the Government's proposed method of examination on Fifth Amendment grounds. They, therefore, oppose the Government's attendance at, or recordation of, examinations conducted by defense experts. Beckford also has submitted an affidavit from Dr. Hart who opines that there are "important advantages of having two rather than one neuropsychological evaluation of the defendant." Hart Aff'd ¶ 4. Although Dr. Hart acknowledges the potential danger of enhanced malingering and so-called "practice effects" skewing the results of a second examination, he asserts that certain neuropsychological tests are available to minimize the negative impact on subsequent evaluation. Moreover, Dr. Hart notes that: "In none of the cases in which I have been involved have the experts for the respective parties recorded the testing sessions and exchanged those tapes with the experts or attorneys for the opposing party in the litigation. I do not believe that [ ] represents the professional norm or that it is critical to the evaluative process." Hart Aff'd ¶ 11. Dr. Ryan, the Government's expert, also acknowledges that the attendance and/or recordation suggested by the Government would be a novel procedure which has not been previously employed in the context of a capital prosecution.

At oral argument, the Government receded from its request for attendance at and the memorialization of, the examinations to be conducted by defense experts because the parties have stipulated that their respective expert witnesses likely will be able to agree, on an *a-priori* basis, on the designation of specific testing measures to be administered by each respective neuropsychologist in order to avoid test overlap and to minimize "practice effects." Moreover, the parties are considering Dr. Ryan's suggestion that data be shared between the experts so that multiple neuropsychological administrations of the same measures can be avoided. The Government is satisfied that, upon reaching such an agreement, recordation would be unnecessary.

For those reasons, the Government provisionally has withdrawn that part of its motion which seeks attendance at and memorialization of defense examinations. The Government is granted leave, however, to renew that part of its motion in the event that the parties' experts cannot reach a mutually agreeable testing protocol. The parties shall inform the Court not later than April 2, 1997 whether agreement has been reached and of its terms.

For the reasons set forth in this Memorandum Opinion, and to the extent herein articulated, the Government's Motion For Notice

**19.** Indeed, in this case, the defendants object to the simultaneous examination by a neutral expert or experts.

and Reciprocal Discovery of Mental Health Defenses to be Raised at Either the Guilt or Penalty Phases of the Trial is GRANTED IN PART and DENIED IN PART.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.